## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE J. MERMAN TRUST and RACHEL KALIN, as trustee for THE J. MERMAN TRUST and as attorney-in-fact for J, THE BENEFICIARY OF THE J. MERMAN TRUST,<br><br>Plaintiffs,<br><br>v.<br><br>ALCHEMY PROPERTIES INC., 378 WEA OWNER LLC, 378 WEA MEZZ LLC, 378 WEA JV LLC, ALCHEMY 378 WEA LLC, KENNETH S. HORN, JOEL BREITKOPF, and ALEXANDER J. SALTZMAN,<br><br>Defendants. | Civil Action No. _____<br><br><br>ECF Case<br><br>**COMPLAINT** |

Plaintiffs The J. Merman Trust ("<u>Trust</u>") and Rachel Kalin, solely as Trustee for The J. Merman Trust and as the appointed attorney-in-fact to prosecute this action for the benefit of the Trust's Beneficiary, J ("<u>J</u>") (the Trust and J, together, "<u>Plaintiffs</u>"), bring this action through counsel.  On knowledge as to their own actions and otherwise on good faith information and belief, Plaintiffs hereby allege against Defendants Alchemy Properties Inc., 378 WEA Owner LLC, 378 WEA Mezz LLC, 378 WEA JV LLC, Alchemy 378 WEA LLC (collectively, "<u>Alchemy</u>"), Kenneth S. Horn, Joel Breitkopf, and Alexander J. Saltzman as follows.

### INTRODUCTION

1.    This is an action to hold Alchemy, a New York City condominium developer, responsible for fraudulently marketing and inducing Plaintiffs to buy—for a small fortune—a condominium unit that it knew to be littered with latent defects

so severe that even now, two years after the unit's sale, it remains uninhabitable. Alchemy sponsored, designed, constructed, and sold the condominium building at 378 West End Avenue in the Historic Collegiate West End District of New York City (the "Building" or "Condominium").  Alchemy's Co-Principals, Kenneth S. Horn and Joel Breitkopf, touted the Building on Alchemy's websites, brochures, and listings (the "Marketing Materials") as the apex of modern luxury.[1]  Penthouse A in particular, (the "Unit" or "Unit PHA"), which Alchemy sold to Plaintiffs, was touted by Alchemy as the Building's "trophy apartment" reminiscent of a "house in the Hamptons."[2]  And Alchemy certified—and Mr. Horn signed—in its publicly filed Condominium offering plan (the "Offering Plan") that the Building and its Condominium units would meet or exceed every requirement of the approved plans and specifications, applicable laws, building codes, and locally accepted building practices.

2.      But it sold Plaintiffs a bill of goods.  The Unit, for which Plaintiffs paid **$24,750,000**, was delivered with significant, hidden defects and fundamental design and construction flaws that Plaintiffs did not, and could not, reasonably discover until after closing in July 2023.  Those flaws have rendered the Unit incomplete, uninhabitable, and even uninhabited today.

---

[1] *The Residences*, 378 WEST END AVENUE, https://378wea.com/residences (last visited July 22, 2025); *378 West End Avenue #PHA*, STREETEASY, https://tinyurl.com/zfk284am (last visited July 22, 2025).

[2] *378 West End Avenue #PHA*, *supra* note 1.

3.      *First*, **the Unit lacks any functional climate or ventilation system**.  Alchemy improperly installed defective heating, ventilation, and cooling ("HVAC") units that simply do not work.

4.      New Yorkers can reasonably expect habitable homes to have sufficient and reliable heating and cooling—last year, nighttime lows dropped to 13° F and daytime highs reached 95° F.  Alchemy, which marketed the Building during the height of the COVID-19 pandemic, promised much more than that bare minimum.  It said that the Building's HVAC systems would be of unmatched quality, even boasting to *The New York Times*[3] and *Wall Street Journal*[4] that the Building would have a "sophisticated air-filtration system" that "emphasiz[ed] air quality" and be complete with advanced HVAC systems featuring "hospital-grade MERV 13 filters" (which, upon information and belief, were never actually installed).

5.      The reality, however, was far different.  Faced with delays (and resulting lost profits), Alchemy cut corners with the HVAC system at every turn.  By the spring of 2023 at the latest—***months before Plaintiffs closed on Unit PHA***—Alchemy knew that the HVAC units it had installed throughout the Building were defective. Rather than replace the units, it concealed them behind sheetrock. It even decided to forego installing customary access panels for the HVAC units—necessary both for

---

[3] C. J. Hughes, *How the Pandemic Has Changed Apartment Building Amenities*, N.Y. TIMES (Sept. 11, 2020), https://www.nytimes.com/2020/09/11/realestate/pandemic-apartment-amenities.html.

[4] Katherine Clarke, *For Wealthy New York Buyers, Small Apartments Aren't Cutting It Anymore*, WALL ST. J. (March 18, 2021), https://www.wsj.com/real-estate/luxury-homes/for-wealthy-new-york-buyers-small-apartments-arent-cutting-it-anymore-11616083215?st=zHRuT6&reflink=desktopwebshare_permalink.

routine maintenance **and** HVAC repairs—meaning that any HVAC repairs necessarily required tearing open the sheetrock once again.  When Condominium occupants inevitably needed to maintain or repair the defective HVAC systems—as Alchemy knew would happen—complaining occupants had to vacate their homes so that contractors could rip open their newly decorated walls and ceilings to service the HVAC systems.  This wholly avoidable scenario was born from Alchemy's cut-rate approach.

6.    Plaintiffs purchased Unit PHA only to discover that Alchemy had taken this "hide now, fix later" approach to the defective HVAC system.  Thus, rather than moving into and settling down in their new home, Plaintiffs had to promptly vacate their home so that contractors could tear open their walls and ceilings just to fix and replace a purportedly brand-new, non-functioning HVAC system.

7.    Additionally, far from "emphasizing air quality," Alchemy allowed the HVAC units to become choked with dust and other debris caused by ongoing construction in the Building—and failed to clean them before selling Unit PHA to Plaintiffs. What's more, Alchemy installed the HVAC units in Unit PHA incorrectly with piping connected to the wrong parts of the machines, rendering them unable to function.  Cutting away the sheetrock further revealed that the HVAC units were crammed into tight nooks, which were then improperly sealed off through shoddy construction work—leaving no room for the HVAC systems to circulate air (or regulate temperature) as intended.  To wedge ill-fitting HVAC units into what space Alchemy's shoddy construction work permitted, Alchemy's subcontractors crudely

stuffed in piping and wires incorrectly, and then suffocated the system by leaving the pipes filled with construction debris. Consequently, the HVAC system crashed—and shut down—within minutes or hours of being turned on. Alchemy was aware of the problem, but rather than disclosing and fixing it, Alchemy concealed it, choosing to sell the Unit with a latent and fundamental defect.

8.      This reality contrasts with the multiple representations Alchemy made about the sophistication of the Condominium's HVAC units, including that its residents could maintain the quality of the system through regular maintenance. In fact, the HVAC units were inoperable and unserviceable, in violation of New York City's Building and Mechanical Codes.

9.      ***Second*, the Unit has been plagued by mechanical and industrial noises not befitting a private home.** Unit PHA has not been the "oasis of comfort" that Alchemy promised.[5]  Instead, it has been inundated with loud, disruptive noises and vibrations stemming from construction flaws and defects.

10.     For example, Alchemy and its contractors failed to install proper gaskets and padding above and below the elevator cars within the shafts. Consequently, when the elevators operate, they emit a loud, popping, clacking, and banging that reverberates throughout Unit PHA—including in its foyers, galleries, kitchen, laundry room, landing areas (which are part of the Unit), and two bedrooms. The noise and its amplitude resemble what one might hear in an apartment above a blacksmith's shop—one that took hammer to anvil all day and all night.

---

[5] *The Residences*, *supra* note 1.

11.    The HVAC installation defects also caused significant noise and vibration issues of their own.  When Plaintiffs first moved into Unit PHA, they discovered that one bedroom was plagued by vibrating walls and an unrelenting, deep, low-frequency sound—the type of feedback produced by a powerful but defective subwoofer.[6]  The associated soundwaves are characterized by their deep pitch and long wavelengths, and are highly resilient, capable of traveling through solid matter and across vast distances.[7]  Indeed, studies have shown that, over time, exposure to such persistent low-frequency noises are powerful stressors for humans—stressors that often increase hypertension.[8]

12.    Only through trying to remediate the HVAC defects described above did Plaintiffs discover that these unrelenting noises and vibrations stemmed from yet even more HVAC installation defects in that bedroom.  This discovery came at great cost, and it left the "bedroom" a construction zone.

13.    Altogether, these obnoxious sounds—in addition to the lack of working HVAC—make the Unit uninhabitable and violate the legal limits for noise levels in private homes under New York City's Noise Code.

14.    ***Third*, Alchemy's construction flaws require the Unit to be barraged by Building maintenance.**  Alchemy's construction defects also

---

[6] These vibration noises register in the 31.5 hertz range, an example of which can be heard at the following YouTube link:  https://www.youtube.com/watch?v=HHg91GFduhk

[7] Unlike main speakers, subwoofers are thus commonly concealed in a cabinet (as in a home theater) or trunk of an automobile without sacrificing fidelity or amplitude.

[8] *See, e.g.*, Juliana Araújo Alves et al., *Low-Frequency Noise and Its Main Effects on Human Health—A Review of the Literature Between 2016 and 2019*, 10 APPLIED SCIS. 1, 2 (2020).

extended to other aspects of the Unit—defects that clashed with Alchemy's characterizations of the Unit. Alchemy referred to the Condominium residences as an "oasis of comfort" and "sanctuaries" that were "[t]houghtfully placed to ensure privacy."[9]

15.    In reality, Alchemy's shoddy construction work means that essential Building services for 17 other units in the Building terminate inside Unit PHA. Any time a plumbing issue occurs for any of those 17 units—including one owned by Mr. Horn—the maintenance staff barge into Unit PHA with repair equipment and disrupt Plaintiffs in their home. Indeed, the Condominium suffers so many problems that, during the two hottest months last year (July and August 2024), **Building staff spent more than 30 hours in the Unit trying to resolve problems in other units.**

16.    Likewise, after construction completed and Plaintiffs tried to move into Unit PHA, fire department inspectors determined that Alchemy and its contractors failed to install necessary sprinkler gauges for the Building's fire suppression system. But rather than install the necessary gauge in a common space, Alchemy decided instead to demolish one of Unit PHA's walls—**after Plaintiffs purchased the Unit**—to install the inspection gauge **inside of Unit PHA**. Therefore, even after selling the Unit, Alchemy continued to conduct patchwork construction work that impaired Plaintiffs' ability to move into the Unit.

---

[9] *The Residences*, *supra* note 1.

17.    ***Fourth*, Alchemy installed blighted and defective finishes throughout the Unit.** While Alchemy boasted of the "crazy, cinematic views"[10] that Unit PHA's residents would enjoy, those views were blighted by windows stained and pitted by chemical burns and scorch marks. The Unit also was delivered with myriad other issues, as detailed below.

18.    If Plaintiffs had known that they were acquiring a condominium unit that was not habitable, they never would have completed and closed on their purchase of the Unit. Plaintiffs expected an "oasis of comfort," not a fixer-upper project sapping away their time, energy, and resources.

19.    Faced with a panoply of problems, 24 months after closing, Plaintiffs have yet to move into the Unit, and not for lack of trying. Plaintiffs—excited about the most significant purchase of their lives—tried for months to live in the space. But it quickly became clear Plaintiffs did not purchase a complete and habitable home. Plaintiffs remained at the mercy of contractors paraded through Unit PHA by Alchemy. Ultimately, as the constant demands by contractors continued, the temperatures dropped below freezing, and the noises kept persisting, Plaintiffs had no choice but to vacate it because of the sheer magnitude of the issues described herein.

20.    In the two years since, Plaintiffs sought to resolve these problems cooperatively. At first, Plaintiffs sought help directly from the Building's management. Soon after, however, it became clear that Plaintiffs' issues resulted

---

[10] *378 West End Avenue #PHA*, *supra* note 1.

from Alchemy's latent construction defects. When Plaintiffs sought assistance from Alchemy, they were rebuffed for an entire month. Only beginning in August 2023, Plaintiffs were able to get ahold of Alchemy employees and eventually, after retaining counsel, Alchemy's Co-Principal, Mr. Breitkopf, to seek Alchemy's help with repairing these latent defects. Despite assurances from Mr. Breitkopf and his representatives that Alchemy would fix each of the defects Plaintiffs identified, Alchemy failed to do so.

21.    In the year that followed, Alchemy paraded one contractor after another to diagnose and re-diagnose the sources of the Unit's defects. For each contractor's visit, Plaintiffs were required to open the Unit and facilitate their work, often at the last minute and without regard to Plaintiffs' schedules. Indeed, on several occasions, contractors arrived unannounced even when Plaintiffs were unavailable to allow them to work in the Unit. In the few times that Plaintiffs were able to stay at Unit PHA, they were often suddenly and unexpectedly forced to vacate so that the contractors could perform remediation work.

22.    For all this inconvenience, however, none of the contractors managed to repair the Unit's defects. For the HVAC system, each contractor offered contradictory assessments—for instance, one blamed incorrectly installed pipes, another blamed shoddy electrical wiring, some pointed to Alchemy operating the system while the air remained full of particulates produced by ongoing construction—and blamed other contractors for shoddy work. None of the contractors was able to solve the Unit's

problems; rather, they consistently compounded the issues by incorrectly guessing at the source of the problems.

23. And even where there were possible fixes, the contractors refused to perform them. Alchemy apparently had failed for months to pay its contractors and partners. Therefore, even where contractors had available replacement parts to resolve certain issues in Unit PHA, those contractors failed to supply those parts, citing Alchemy's overdue bills.

24. After months of no progress, Plaintiffs' patience wore thin.

25. By August 2024, Alchemy finally agreed that Plaintiffs could fix the issues themselves. Alchemy claimed it would assist Plaintiffs in any way it could, and that it would compensate Plaintiffs for their troubles.

26. Given the green light, Plaintiffs hired their own contractors and experts to diagnose the issues in the Unit. Those contractors quickly uncovered root causes of the HVAC and noise issues that Plaintiffs suffered—subpar construction and improper installation. Plaintiffs' contractors determined that fixing the HVAC problems alone would be extensive, requiring, among other work: (a) cutting into the sheetrock in multiple rooms, (b) opening up air circulation vents in the ceiling plenum, (c) uninstalling and replacing HVAC systems and components weighing more than 50 lbs. apiece from the ceiling plenum, (d) installing access doors to allow access to the HVAC systems for future maintenance and repair, and (e) replacing improper mounting joints causing noise and vibration. All this before even

addressing the persistent noise issues arising from other construction defects affecting the Unit.

27.     Plaintiffs' contractor worked in good faith to supply proposed work plans to the Building's management company, Orsid.  After receiving written approval to commence the HVAC remediation work on August 14, 2024, Plaintiffs' contractor began opening up the Unit's ceilings and walls to perform the repairs.  But in the middle of that remediation work, with the Unit's ceilings and walls torn open, Orsid ordered Plaintiffs' contractors to halt any further work.  Only then, for the first time, Orsid demanded Plaintiffs execute an "Alteration Agreement" to continue the remediation work.  The demanded agreement included language purporting to broadly release Alchemy of any liability related to, and any obligation to reimburse Plaintiffs for, undefined "Work."

28.     Plaintiffs later learned that Alchemy conspired with the Building's Board of Managers and Orsid to prevent Plaintiffs from finally diagnosing (and discovering) the full extent of Alchemy's construction defects and fixing them.  To this day, both the Board of Managers and Alchemy have declined even to negotiate the terms of the purported "Alteration Agreement" that would enable Plaintiffs to be reimbursed for performing the remediation work in the Unit.

29.     Consequently, rather than obtaining the "trophy apartment" that was "designed for the way people live today,"[11] Plaintiffs have been left with an

---

[11] *378 West End Avenue #PHA*, *supra* note 1.

uninhabitable construction site and a years-long fight against an underhanded New York City developer.

30.    Left with no choice, Plaintiffs sue to hold Defendants accountable for their misconduct and the harm caused by their fraudulent misrepresentations to induce Plaintiffs to purchase Unit PHA.

## **PARTIES**

31.    Plaintiff The J. Merman Trust is a nominee trust established to hold real estate title on behalf of its Beneficiary, Plaintiff J.  The Trust publicly holds title to the Unit for the benefit of J.  J, an individual, at all relevant times herein has been a resident of and domiciled in New Hampshire.

32.    Rachel Kalin serves as Trustee for the Trust.  As the Trustee, Ms. Kalin also has been appointed as attorney-in-fact by J to file and pursue any and all legal claims on behalf of the Trust and for the benefit of J as the Trust's Beneficiary.  At all relevant times herein, Ms. Kalin has been a resident of and domiciled in Massachusetts.

33.    On July 11, 2023, Plaintiffs purchased and obtained from Alchemy the title to Unit PHA in the Building at 378 West End Avenue, New York, New York for a purchase price of $24,750,000.

34.    Defendant Alchemy Properties Inc. is a corporation formed under the laws of New York, on or about November 1, 1990, and has its principal place of business at 800 Third Avenue, 22nd Floor, New York, New York.  At all relevant times herein, Alchemy Properties was the Selling Agent retained by the Sponsor in connection with the offering of units in the Building.

35.     Defendant Kenneth S. Horn is the Founder and President of Alchemy Properties Inc.  Mr. Horn is a resident of New York.  At all relevant times, Mr. Horn served also as the Principal of Alchemy Properties' alter ego, Defendant 378 WEA Owner LLC, in connection with the sponsorship and development of the Condominium.  Mr. Horn also served as a member of the initial Board of Managers of the Condominium.  On information and belief, Mr. Horn was actively involved in all aspects of the development and construction of the Building, including the design, construction, and offering of units in the Building.

36.     Defendant Joel Breitkopf is a Co-Principal of Alchemy Properties.  Mr. Breitkopf is a resident of New York.  At all relevant times herein, Mr. Breitkopf was an employee of Alchemy Properties and served as Alchemy's designated member on the Condominium's Board of Managers, which term ended on or about May 2025— after the events giving rise to Plaintiffs' claims herein.  On information and belief, Mr. Breitkopf was actively involved in all aspects of the development and construction of the Building, including the design, construction, and offering of units in the Building.  Mr. Breitkopf was also directly involved in communications with Plaintiffs, including representations he made on behalf of Alchemy and as a member of the Condominium's Board of Managers.

37.     Defendant Alexander Saltzman was Vice President of Development at Alchemy Properties.  Mr. Saltzman is a resident of New York.  During the relevant period described herein, Mr. Saltzman was an employee of Alchemy Properties and served as a member of the initial Board of Managers of the Condominium.  On

information and belief, Mr. Saltzman was actively involved in all aspects of the development and construction of the Building, including the design, construction, and offering of units in the Building.

38.    Defendant 378 WEA Owner LLC ("378 WEA Owner") is a limited liability company formed under the laws of Delaware, formed on August 9, 2018, and has its principal place of business at 800 Third Avenue, 22nd Floor, New York, New York 10022.  378 WEA Owner is the designated Sponsor of the Condominium.

39.    Defendant 378 WEA Mezz LLC ("Mezz") is a limited liability company formed under the laws of Delaware, formed on August 9, 2018, and has its principal place of business at 800 Third Avenue, 22nd Floor, New York, New York 10022.  It is the sole member of 378 WEA Owner.

40.    Defendant 378 WEA JV LLC ("JV") is a limited liability company formed under the laws of Delaware, formed on August 9, 2018, and has its principal place of business at 800 Third Avenue, 22nd Floor, New York, New York 10022.  It is the sole member of Mezz.

41.    Defendant Alchemy 378 WEA LLC ("Alchemy 378") is a limited liability company formed under the laws of Delaware, formed on August 9, 2018, and has its principal place of business at 800 Third Avenue, 22nd Floor, New York, New York 10022.  It is the administrative member of JV and authorized to take actions and decisions to cause Sponsor to develop the Condominium.

42.    Defendants 378 WEA Owner, Mezz, JV, and Alchemy 378  (collectively, the "378 WEA Shell Companies") are all shell companies formed by Alchemy

Properties and Mr. Horn in connection with the sponsorship, financing, and development of the Condominium that, as described below, are alter egos of Alchemy Properties. The 378 WEA Shell Companies and Alchemy Properties are collectively referred to as "Alchemy."

## JURISDICTION AND VENUE

43. The Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert a claim arising under the Interstate Land Sales Full Disclosure Act ("ILSFDA"), 15 U.S.C. § 1703(a)(2). This Court also has supplemental jurisdiction over Plaintiffs' related state-law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they derive from a common nucleus of operative facts.

44. The Court also has diversity jurisdiction over all of Plaintiffs' claims under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is complete diversity between the parties. Plaintiffs J. Merman Trust and J, the Trust's Beneficiary, are citizens of New Hampshire, and Ms. Kalin, solely as Trustee for the Trust and attorney-in-fact prosecuting this action for the benefit of J, is a citizen of Massachusetts. No Defendant is a citizen of New Hampshire or Massachusetts.

45. The Court has personal jurisdiction over Defendants because each resides in or maintains its principal place of business in New York. The Court also has personal jurisdiction over each Defendant because the specific events and acts giving rise to Plaintiffs' claims occurred in New York, including but not limited to: (i) Defendants' development, construction, and sale of the Unit; (ii) Defendants'

failure to perform or substantially perform their obligations under the Offering Plan and the Purchase Agreement, as described below; (iii) Defendants' failure to use reasonable care in the construction of the Unit and the installation of certain equipment, such as the HVAC system, in the Unit; (iv) Defendants' fraudulent concealment of the latent construction and installation defects in the Unit; and (v) with respect to Messrs. Horn, Breitkopf, and Saltzman, their breaches of their fiduciary duties of care, good faith, and loyalty to the Condominium in prioritizing Alchemy's profits and cutting corners and costs to the detriment of the Condominium.

46.    Venue is proper under 28 U.S.C. § 1391 because, among other reasons, all Defendants reside, are found, and/or transact their affairs in this District.

## BACKGROUND

### I.    Alchemy Converts an Upper West Side Landmark Into Condominiums.

47.    Alchemy Properties has been prominent in the New York City property development industry for decades.  Founded by Mr. Horn in 1990 and now led by Messrs. Horn and Breitkopf, Alchemy began as a condominium developer, focusing on acquiring and refurbishing existing structures and marketing them as luxury condominiums.

48.    Alchemy has primarily developed smaller buildings into condominium units.  Its luxury projects have included the RAMSA-designed condominium at 251 West 81st Street on the Upper West Side and converting the upper floors of the Woolworth Building into condominium spaces.  The last of Alchemy's Woolworth

units sold in 2023—9 years after completion, and for 27% of Alchemy's initial $110 million asking price.[12]

49.    More recently, Alchemy has faced protests over its effort to raze and transform the West-Park Presbyterian Church into condominium units, which has been resisted by notable figures like Mark Ruffalo, Amy Schumer, Common, Wendell Pierce, and City Council member Gale Brewer.[13]

50.    While Alchemy still develops condominiums, it has also expanded into new ventures including Alchemy-ABR Investment Partners, a commercial and multifamily real estate investment company, and Alchemy Ventures, a small-property real estate company.  Today, Alchemy has its fingerprints on residential and commercial real estate properties of all varieties throughout New York City.

51.    In 2018, Alchemy saw a condominium development opportunity for an Upper West Side landmark, the Collegiate School building at West 78th Street and West End Avenue.

52.    Originally built in 1915, the Collegiate School building was a 12-story Palazzo-style building listed on the National Register of Historic Places.  In 2015, the owners of the Collegiate School, the unaffiliated West End Collegiate Church,

---

[12] Katherine Clarke, *Woolworth Building's 'Pinnacle' Penthouse, Once Asking $110 Million, Sells for $30 Million*, WALL ST. J. (Aug. 4, 2023), https://www.wsj.com/real-estate/luxury-homes/woolworth-building-penthouse-sells-for-30-million-bc55e3fd?mod=Searchresults_pos4&page=1.

[13] Jack Ahern, *West Park Congregation Pulls Hardship Application Seeking Permission to Raze UWS Church*, WEST SIDE SPIRIT (Jan. 9, 2024), https://www.westsidespirit.com/news/west-park-congregation-pulls-hardship-application-seeking-permission-to-raze-uws-church-YJ3029607.

obtained approval from the Landmarks Preservation Commission to convert the school into condominiums using a design proposed by COOKFOX Architects.

53.    Alchemy acquired title to the land, buildings, and development project from the West End Collegiate Church for $158 million on September 7, 2018, which included 378 West End Avenue and the adjoining 260-to-262 West 78th Street. Alchemy then worked to demolish and construct replacement 19-story and 12-story towers to create what would become the combined Building.[14]

## II.    Aiming to Evade Liability for Harm Caused By Development and Construction It Would Direct, Alchemy Forms Alter Egos.

54.    In connection with the sponsorship, financing, and development of the Condominium, Alchemy Properties and Mr. Horn formed four special purpose entities ("SPEs"):  378 WEA Owner, Mezz, JV, and Alchemy 378, previously defined as the "378 WEA Shell Companies."

55.    Alchemy routinely creates SPEs for the sole purpose of acting as the nominal "sponsor" or "developer" of a particular condominium project.  These entities, however, are not formed to operate legitimate, ongoing businesses.  These SPEs are often thinly capitalized, have no employees, and exist only on paper.  Once a project is completed and Alchemy has extracted profits through unit sales, Alchemy winds

---

[14] Michael Young, *COOKFOX's 378 West End Avenue Progressing, Sales Launch, On Manhattan's Upper West Side*, N.Y. YIMBY (Apr. 14, 2021), https://newyorkyimby.com/2021/04/cookfoxs-378-west-end-avenue-progressing-sales-launch-on-manhattans-upper-west-side.html; Tanay Warerkar, *Historic Upper West Side School Will Become a 19-Story Condo*, N.Y. CURBED (Sept. 12, 2018), https://ny.curbed.com/2018/9/12/17850140/upper-west-side-collegiate-school-condo-conversion; Lois Weiss, *Ken Horn Plans Tower on Upper West Side Church Site*, N.Y. POST (Sept. 11, 2018), https://nypost.com/2018/09/11/ken-horn-plans-tower-on-upper-west-side-church-site/.

down its SPEs or abandons them entirely. The 378 WEA Shell Companies are no different, and are mere alter egos of Alchemy Properties.

56.     To start, Alchemy Properties shares common ownership, officers, directors, and employees with the 378 WEA Shell Companies. The 378 WEA Shell Companies are undercapitalized, perform no independent functions, and lack the operational separateness required of distinct corporate entities.

57.     The 378 WEA Shell Companies were all formed on the same date and share their principal place of business with Alchemy Properties: 800 Third Avenue, 22nd Floor, New York, New York 10022. These entities have no independent offices, employees, or business operations, and they are managed entirely by personnel employed by Alchemy Properties.

58.     Alchemy Properties exercises total control over the 378 WEA Shell Companies. Specifically, Alchemy Properties directs every aspect of the development, marketing, and sale of the Condominium.

59.    Alchemy Properties—not any of the 378 WEA Shell Companies—publicly holds itself out as the developer of the Condominium.  The Marketing Materials identify Alchemy Properties as the party responsible for the project. Alchemy Properties' website has listed the Condominium as one of its "active" real estate projects.[15]



60.    The Condominium's website touts the Building as being "developed by Alchemy Properties."[16]  Alchemy Properties further posted numerous press articles on its website that refer to Alchemy Properties as the developer of the Condominium.[17]  None of the 378 WEA Shell Companies is mentioned.

---

[15]    *Active Projects*, ALCHEMY PROPERTIES, https://alchemy-properties.com/alc-properties/portfolio/#active (last visited May 16, 2025).

[16]    *The Building*, 378 WEST END AVENUE, https://378wea.com/building (last visited July 22, 2025).

[17]    *In the News*, 378 WEST END AVENUE, https://378wea.com/press (last visited July 22, 2025).

61.    Moreover, Alchemy—not any of the 378 WEA Shell Companies—has communicated directly with Plaintiffs concerning Unit PHA through Alchemy Properties' email domain, "@alchemy-properties.com."    The several Alchemy Properties employees with whom Plaintiffs have communicated have referred to themselves interchangeably as either "Alchemy" or the "Sponsor," underscoring the absence of any true separateness.    Plaintiffs have yet to encounter anyone who has an email address from, or represents as working for, any of the 378 WEA Shell Companies.

62.    Furthermore, other unit owners who experienced construction defects, as explained more fully below, also directed their complaints to Alchemy Properties and their employees—not to the 378 WEA Shell Companies.

63.    In short, the 378 WEA Shell Companies are alter egos of Alchemy Properties.    Because Alchemy Properties and the 378 WEA Shell Companies operate as a single, unified enterprise, Plaintiffs refer to them collectively herein as "Alchemy."

## III.    Alchemy's Offering Plan Touts the Building's and Units' Qualities.

64.    In connection with the Building's development, Alchemy prepared and filed an Offering Plan with New York's Department of Law on December 24, 2019. Required under New York Codes, Rules, and Regulations (NYCRR) Title 13 Part 20, an offering plan is required to disclose to potential purchasers much information about the condominium.    Among other issues, the offering plan must include a description of both the property and each unit, the number and types of units available, the offering prices for each unit, the percentage of common interests and

fees in the condominium building attributable to each unit, and whether any major fixtures or equipment are not included in the offering price.

65.    Additionally, offering plans are required to state the sponsor's obligation to build and complete the condominium in accordance with the building plans and specifications identified in the plan, with the proviso that the sponsor may modify the plans or specifications and to substitute in their place designs, equipment, or fixtures that are equal to or better than provided in the plan.  Likewise, a sponsor may not make layout changes affecting the percentage common interests or adversely affecting the value of any unit to which title has closed absent written consent of the purchaser.

66.    Alchemy prepared and submitted the Offering Plan to the Department of Law of the State of New York on December 24, 2019, which was accepted on October 8, 2020 and declared effective on June 14, 2021.  Alchemy has since submitted five amendments to the Offering Plan.

67.    The Offering Plan provides that Alchemy was actively involved in the development and management of the Condominium.  On information and belief, Alchemy and Messrs. Horn and Breitkopf inspected the work and supervised the various tradespeople and subcontractors that worked on the project, including those that worked on the installation and construction of the elevators and the HVAC and windows in each condominium unit.

68.    The Offering Plan also highlights the many obligations that Alchemy had regarding the Building and its units.  The obligations include:

a.    "Sponsor must comply with all obligations imposed by the Offering Plan, approved building Plans and Specifications (as potentially modified), applicable statutes and regulations, building codes and locally accepted building practices."[18]

b.    "Sponsor will bear all costs and expenses incurred for the authorized and proper work involved in the construction and establishment and sale of the Condominium that Sponsor is obligated to complete under the Plan . . . ."[19]

c.    "Sponsor will not be obligated to correct . . . except as a result of any  defects in construction, or in the installation or operation of any  mechanical  equipment,  appliances,  other  equipment, finishes, materials or fixtures."[20]

d.    "Where materials, appliances, equipment, fixtures, and/or other construction or design materials and details are specified, Sponsor reserves the right to substitute in each instance one of equivalent or better quality as recognized by industry standards

---

[18] Offering Plan at 4.

[19] *Id.* at 126.

[20] *Id.* at 197.

for performance, efficiency, longevity, and/or classifications, as applicable."[21]

69.    The Offering Plan also contains certain affirmative representations made by Alchemy to prospective purchasers regarding the present condition of the Building and its units, including these:

a.    "Sponsor hereby adopts the Description of Property set forth in Exhibit 4 in Part II of the Plan and represents that it has no knowledge of any material defects or need for major repairs to the Property."[22]

b.    "The Building, including the individual Units therein, is being constructed in accordance with the Plans and Specifications and all applicable zoning and building laws, regulations, codes and other government requirements."[23]

70.    The Offering Plan also advised on the HVAC systems installed in the Condominium, including their features and maintenance requirements:

a.    "Each individual Unit is provided with incremental HVAC heating/air conditioning units which should be cleaned and maintained at least twice per year by the individual Unit Owner or the Condominium.  The maintenance and operating cost of the

---

[21] *Id.* at 236.

[22] *Id.* at 184.

[23] *Id.* at 45.

HVAC units are borne by the individual Unit Owners,"[24] and the "Purchaser should note that each HVAC unit will need to be cleaned and its filters changed on a regular basis at Purchaser's sole cost and expense."[25]

71.    Alchemy and Mr. Horn also filed and signed a certification (the "Certification") that they reviewed the entire Offering Plan and investigated the representations of fact therein, and exercised due diligence to form a basis for the Certification.  Alchemy and Mr. Horn then jointly and severally certified that the Offering Plan, among other things, did not:

>   (iii) omit any material fact;
>
>   (iv) contain any untrue statement of a material fact;
>
>   (v) contain any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;
>
>   (vi) contain any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances.[26]

72.    The Certification was expressly given "for the benefit of all persons to whom this offer is made," who may rely upon it in forming their judgment concerning the design and construction of the Building.[27]

---

[24] *Id.* at 66.

[25] *Id.* at 65.

[26] *Id.* at 454.

[27] *Id.* at 455.

IV.  **Alchemy Installs Itself as the Initial Board to Oversee Construction So That It Could Cut Corners.**

73.     Under the terms of the Offering Plan, Alchemy selected and installed an initial Board of Managers (the "Initial Board") on December 24, 2019 when the plan was submitted to the Attorney General's Real Estate Finance Bureau for review. The Initial Board comprised Alchemy's leadership—Messrs. Horn, Breitkopf, and Saltzman who served as President, Vice President, and Secretary/Treasurer of the Initial Board, respectively.

74.     Alchemy thus controlled the Initial Board.  On information and belief, each member of the Initial Board was intimately involved in all aspects of directing the design, construction, and sales of the project, and had intimate knowledge of the Building's affairs, including the specific conditions of the units therein.

75.     Alchemy began work on the Building in late 2018.  While COOKFOX's architectural design—which predated Alchemy's involvement—was lauded by the Landmark Preservation Commission and the local community, Alchemy failed to execute on that design with the workmanship standards expected of a high-end condominium building.

A.     **Alchemy Used a Cut-Price, Slapdash Construction Process.**

76.     Alchemy turned to Leeding Builders Group ("LBG") to serve as the general contractor for the Building.  Both Alchemy and LBG, however, failed to properly construct the Building according to customary workmanship standards.

77.     To begin, Alchemy and LBG employed substandard subcontractors to construct the Building; many had never before worked on the construction of a luxury

condominium building.  Rather than pay for experienced journeymen, Alchemy opted for a cheaper workforce that could help maintain its bottom line.

78.    For example, Alchemy relied on JDR Mechanical Corporation ("JDR") to install ductless Samsung HVAC systems throughout the Building and in all the residential units.  JDR, however, had no experience working in high-end luxury condominium buildings and is reputed by other HVAC installers—including those Alchemy has also employed—to be ill-equipped to work on the Building.  Even though Alchemy has claimed to Plaintiffs that HVAC repairs are complicated and sophisticated work not to be entrusted to just any contractor, Alchemy nonetheless used JDR to handle one of the most essential elements of construction.

79.    Alchemy also relied on cut-rate subcontractors to work on other discrete projects throughout the Building—such as establishing the wall framework, installing sheetrock, and installing ceilings, none of which Alchemy properly coordinated to ensure consistent, quality work.  Consequently, the Building—and its 58 units—were constructed in piecemeal fashion, where a potential solution to one subcontractor's problems had to be jerry-rigged by another.

80.    Alchemy's problematic use of inexperienced and cheap labor became particularly acute as construction continued through the height of the COVID-19 pandemic in 2020 and 2021.  Faced with a longer (and less profitable) construction schedule than it had planned, Alchemy's focus apparently shifted to preserving its profitability by any means necessary at the expense of the Building's quality.  Indeed, on information and belief, Alchemy cut approximately $20 million from its

construction budget around this time to squeeze out every penny it could get from the project. To use Alchemy's own words, "strong returns for [its] partners and investors" and "[p]reservation of capital" have always been its primary goals, which are "emphasized ***at every point*** in an asset's investment cycle."[28]

81. These cost cuts and piecemeal construction efforts created cascading problems throughout the Condominium.

82. For example, each residential floor of the Building, like many other New York City condominiums, comprises five layers: (1) the floor, (2) the interior space, (3) a suspended (or "false") ceiling, (4) the ceiling plenum through which other cables or HVAC units may be located, and (5) the structural ceiling. On each floor of the Building, Alchemy relied on the lowest-cost subcontractors to separately (a) raise the steel framework for interior walls, (b) mount sheetrock for the walls, and (c) construct the interior ceilings of the Building. Yet Alchemy failed to coordinate or properly sequence the work of these subcontractors, and it also failed to inspect the work. Thus, as evidenced in multiple units throughout the Building, Alchemy's contractors raised interior sheetrock walls that reached improperly from the floor all the way to the structural ceiling, rather than the lower ceiling, which sealed off the ceiling plenums in each Condominium unit.

83. This construction flaw compromised the HVAC system Alchemy and its contractors installed in the Condominium. "Central air" HVAC systems installed in

---

[28] *Overview*, ALCHEMY PROPERTIES, https://alchemy-properties.com/alc-properties/overview/ (last visited July 22, 2025) (emphasis added).

New York City condominiums are designed to heat or cool a certain square footage (often equating to multiple rooms per HVAC unit) through a combination of forced air and natural convection recirculation across those spaces. To do so, such HVAC systems blow heated or cooled "conditioned" air into the living space, which creates positive air pressure in that space. The resulting effect moves the stale air already in the living space to a lower-pressure environment—typically through simple ceiling grilles that act like an escape valve for the room's air. While elsewhere, return air would travel through an enclosed air duct, in New York City, that lower-pressure environment for return air is the ceiling plenum—an empty expanse between the false ceiling and the structural ceiling—through which return air could flow freely back to the HVAC units for conditioning. And so on.

84.    Alchemy's unqualified subcontractors therefore harmed the HVAC system's design by sealing off the ceiling plenum, preventing stale air from recirculating return air back to the HVAC units. Consequently, the HVAC system simply could not properly heat or cool the living space. Alchemy has done nothing to remediate or reverse this problem.

85.    As described further below, Alchemy's subcontractors also persisted in installing defective Samsung HVAC systems throughout the Condominium without proper access panels, meaning that any maintenance, repair, or replacement of those systems required cutting into sheetrock to access them.

86.    Alchemy also permitted its subcontractors to take shortcuts in mounting the HVAC units directly to walls or ceilings, allowing the transmission of noise and

vibration through the structure. For example, this shortcut measure was employed within the walls of Unit PHA's Bedroom 4, which, as described below, created intolerable noises and vibrations.

87.    Alchemy and LBG's contractors also cut corners with critical plumbing and building safety systems. For example, Alchemy and its contractors installed low-cost, defective valves in the common bathrooms located near the Condominium's basement-level amenities. In May 2024, at least one of those valves failed, causing the Condominium's sub-cellar to flood and destroying nearly all of the amenities in Cellars 1 and 2, including the gym, pool, lockers rooms, bathrooms, and music room, making them unusable for nearly two months.

88.    Alchemy's cost cuts affected the elevators as well. While customary to install padding and cushioning bladders in the elevator shafts to muffle any noise as the elevator cars halt at the top and bottom of the shaft, Alchemy and its subcontractors failed to do so in the Building. As a result, the elevators emit loud clanging and banging noises at all times of day—noises that register in Unit PHA as 900% louder to the human ear than the ambient level. These noise levels register far above the accepted limits under New York City's Noise Code.

89.    Even the Building's facade is subpar. Only a handful of years after constructing the Building's facade, the Building is already required to erect scaffolding to address issues with the Building's surface. On information and belief, Alchemy has cut corners with the material it used to construct the Building's facade,

and is now attempting to push the remediation costs of its failures onto Condominium owners and the Condominium's Board.

90.    These combined problems tell a story of a luxury condominium building built not for "the way people live today," but rather to emphasize "preservation of capital" at "every point in any asset's investment cycle."  Unfortunately for Plaintiffs, the construction defects throughout the Unit render it fundamentally incomplete and uninhabitable as a home.

91.    Only through discovery will Plaintiffs uncover the full extent to which Alchemy cut corners to preserve its own bottom line at the expense of the Condominium, Plaintiffs, and all other unit owners.

### B.    Alchemy Knew That HVAC Construction and Installation Defects Pervaded the Condominium But Concealed Them.

92.    Alchemy's cost cuts soon manifested the predictable defects and failures throughout the Condominium, including those affecting Plaintiffs' Unit PHA.  As early as summer of 2022, and in no event any later than spring of 2023, Alchemy became aware that it installed defective HVAC units throughout the Building. Alchemy tried to resolve these issues directly with the most vociferous unit owners quietly while still publicly touting the Building's construction quality, highlighting in particular the sophistication of its HVAC units.

93.    Alchemy and its employees had their own issues with the HVAC system in Unit PHA beginning in or around October 2022.   At that time, Alchemy began using Unit PHA as a "staged apartment" for the Condominium—the showroom floor model for potential buyers.  Alchemy was often in and out of Unit PHA for months,

and used the HVAC system particularly on warm days. On multiple occasions, Alchemy's sales representatives complained about the temperature in the Unit (which had failed to be effectively controlled by the HVAC system), in some cases asking Building staff to "fix" the inability to regulate the Unit's temperature.

94. In the spring of 2023, as temperatures began to climb, the Condominium's new unit owners began using their HVAC systems. That is when many unit owners discovered that their HVAC systems were plagued by constant loud mechanical noises—often whirring, grinding, rattling, or squeaking sounds. The source of these loud mechanical noises were defective fan coil units ("FCUs") in the HVAC units. At around this time (still before Plaintiffs purchased Unit PHA), unit owners began flooding the Building staff and Alchemy with complaints.

95. According to Building staff, Alchemy began quietly replacing the FCUs on a unit-by-unit basis in spring of 2023. The replacement process was not, however, as straightforward as it should have been. LBG and JDR had no choice but to cut giant holes in ceilings to service and replace the FCU motors and then close up the ceilings with drywall. LBG and JDR were required to tear open ceilings because Alchemy had cut costs and elected to forgo access panels—metal doors that are customarily installed so that residents and technicians have easy access to the units, which always require maintenance, repair, and, at some point, replacement.

96. In July 2023, just after Plaintiffs closed on Unit PHA and tried to move into their new home, Alchemy's HVAC subcontractor, JDR, and others in the Condominium informed Plaintiffs that other units had been experiencing widespread

HVAC issues stemming not just from manufacturing defects, but material installation defects too.

97.     This was confirmed on July 27, 2023—days after Plaintiffs closed on the Unit—when Alchemy acknowledged that it had installed defective HVAC systems throughout the Condominium. On that day, Plaintiffs received a Condominium-wide email from Alchemy explaining that it was working with Samsung and JDR to replace HVAC units affected by a known defect causing significant mechanical noises, and that the process was "ongoing."

98.     On August 28, 2023, Plaintiffs met with Alchemy's Brendan Vogt to perform another walkthrough of the Unit. During that walkthrough, Vogt confirmed the presence of manufacturing defects with the HVAC FCUs, which caused excessive noise and operational issues after installation. Vogt conceded that the defect was neither unexpected nor isolated, but rather much like defects encountered in other units.

99.     Finally, at the Annual Meeting of the Condominium on October 3, 2023, Messrs. Horn and Breitkopf spoke at length about how they learned after several complaints from residents in early spring 2023 that the FCU issues were a widespread problem across multiple NYC buildings that used Samsung HVAC units. While Alchemy tried to deflect responsibility, in doing so, they admitted their vast knowledge of HVAC defects predating July 2023 and their concealment of such defects when Plaintiffs closed on Unit PHA.

100.   In short, Alchemy continued to extol the quality of Unit PHA when Plaintiffs signed the Purchase Agreement, all while eliding that Unit PHA suffered from known defects in all ten of its HVAC units.

## V.   Alchemy Markets the Building and Unit PHA as Luxury Dwellings Despite Known Construction Defects.

101.   While Alchemy knew about the pervasive construction defects in the Condominium, Alchemy began rolling out promotional material and opening the Building up for sales in 2021, before construction was completed.[29]  Said Mr. Horn at the time, "Following our successful development and sellout of the RAMSA-designed Two Fifty West 81st Street condominium, we are excited to unveil 378 West End Avenue, an unprecedented offering on the Upper West Side that is already resonating with buyers. Its extensive suite of amenities, including a squash court, basketball court, swimming pool, and music room and recording studio, are not typically available in a building of this size."[30]

102.   Through its Marketing Materials, Alchemy described the units as "elevated with gracious proportions and rich materiality."[31]  Alchemy further proclaimed that the Condominium and its units were "[d]esigned for the way people live today" and benefit from a "welcoming interplay between the classic and

---

[29] Young, *supra* note 14.

[30] *Id.*

[31] *The Residences*, *supra* note 1.

contemporary" with "[t]op-of-the-line technology."[32]  The Condominium's units were "sanctuaries . . . that provide an oasis of comfort" in escaping the noise of the city.[33]

103.  For Unit PHA, Alchemy boasted a "trophy apartment . . . a house in the Hamptons, but in the city, with a total of 6,169 interior square feet with five bedrooms, big views from every single window, gorgeous light and a large, south facing terrace."[34]  Alchemy praised the entertaining space in Unit PHA as "unmatched," and the primary bedroom suite it compared to a "five-star hotel" with each and every room surrounded by big windows and "crazy, cinematic views" of the city.

104.  Alchemy zeroed in on the HVAC systems in particular, saying that the Building's "[t]op-of-the-line technology" included state of the art "air filtration systems."[35]  Mr. Breitkopf repeated the claim to the *Wall Street Journal*, saying that the Building was implementing a "more sophisticated air-filtration system."[36] Alchemy told *The New York Times* that the Building was "emphasizing air quality" and installing advanced HVAC systems with "hospital-grade MERV 13 filters," to which the *Times* gushed that Alchemy was "sparing-few-expenses" in constructing a COVID-conscious building.[37]  Alchemy made these representations knowing that the

---

[32] *Id.*

[33] *Id.*

[34] *378 West End Avenue #PHA*, *supra* note 1.

[35] *Id.*

[36] Clarke, *supra* note 4.

[37] Hughes, *supra* note 3.

pandemic had devastated New York and with hopes of capitalizing on New Yorkers' suffering to extract ultra-premium pricing for COVID-resistant homes. Alchemy did extract those prices, but its marketing was a sham: on information and belief, the MERV filters were never installed.

## VI. Alchemy Receives a Temporary Certificate of Occupancy for Unit PHA Based on a Cursory Inspection of the Unit.

105.  New York City requires all buildings to be inspected through each phase of construction. The New York City Department of Buildings (the "Department of Buildings" or "DOB") is nominally responsible for conducting those inspections. The DOB is also the issuing entity for Final Certificates of Occupancy ("FCO") and Temporary Certificates of Occupancy ("TCO"). Until the DOB issues a FCO or TCO, no one may legally occupy the building or covered units.

106.  An FCO confirms that the completed work complies with all applicable laws and matches the submitted plans, all paperwork has been completed, all fees have been paid, all relevant violations have been resolved, and all necessary approvals have been received. The Department of Building will only issue a FCO after going through a strict and arduous approval process, involving numerous inspections with the state to satisfy habitation requirements and requirements of all applicable laws and regulations. The building owner must acquire all outstanding permits and sort unresolved violations, which can be a complicated affair.

107.  Indeed, Alchemy's Offering Plan provides that it must obtain an FCO in connection with the Building:

SPONSOR AND ITS PRINCIPALS ARE OBLIGATED TO
PROCURE THE FINAL CERTIFICATE OF OCCUPANCY

FOR THE ENTIRE BUILDING AND SHALL EXERCISE
BEST EFFORTS TO OBTAIN THE FCO WITHIN SUCH
TWO (2) YEAR PERIOD. (Off. Pl. at 18.)

108.   But Alchemy still has not obtained a FCO after 39 months since closing

its first unit in the Building.

109.   Instead, Alchemy has sustained nominal legal occupancy in the

Condominium by continually renewing its TCOs.  Alchemy received its first TCO for

most of the units in the Building on March 15, 2022, which it has renewed *17* times.

Unit PHA was not included in any of the initial TCO renewals until the fourth

renewal on October 25, 2022.

110.   The process of obtaining and renewing a TCO is easier than having to

meet the stricter requirements for a FCO.  The Department of Buildings will issue a

TCO if it determines that the property is safe to occupy, but there are outstanding

issues that must be resolved before a FCO can be issued.

111.   Yet TCO issuance means little.  To obtain a TCO, the DOB need only

sign off on temporary inspection, plumbing, electrical, and elevator forms, which is a

cursory process compared to the more inflexible inspection process for an FCO.

112.   In fact, TCOs are not always issued by inspectors employed by the

Department of Buildings.  Most buildings rely on a cottage industry of *private*

inspectors—particularly for electrical, HVAC, and plumbing systems—hired and paid

by the general contractor to review any work.  Those private inspectors issue

"Technical Reports" that nominally certify compliance with particular standards, but

in reality do no more than reflect a checkmark and dated inspector initials—the

proverbial rubber stamp.  The DOB, in turn, checks self-certified applications for

completeness without any further examination. In short, the DOB allows property developers to self-certify their compliance with little oversight.[38]

113. As former Richmond County District Attorney William L. Murphy explained, TCOs "allow[] development to take place without the protections of a permanent certificate, and the homeowner is left holding the bag," and "[i]f you look at the process, accountability doesn't seem to be one of its high points."[39] The self-certification process has been blamed as the "cause of collapsed buildings, cascading facades, chronic corruption and homeowners left stranded with slipshod construction and no permanent certificates of occupancy."[40]

114. In the TCO shell game, only the real estate developers win. In one case, a luxury real estate developer who sold units with TCOs failed to obtain a FCO based on various building code violations. However, since the developer had sold all the units in the building and had allowed the TCO to expire, the **residents** found themselves unable to sell or refinance their units, and staying in the building meant violating the law and being subject to a vacate order from the City.[41]

---

[38] Seth Pruss, *Buyer Beware: Temporary Certificates of Occupancy & the Need for Consumer Protection in the New York City Real Estate Market*, 2 BROOK. J. CORP. FIN. & COM. L. 511, 519 (2008).

[39] *Id.*

[40] *Id.* at 519–20.

[41] *Id.* at 511.

115.    Alchemy is no different here.  Like many other real estate developers in the city, Alchemy relied on private inspectors to obtain TCOs to apply to the entire Condominium, including Plaintiffs' Unit.

116.    Here, Alchemy turned to Mauricio Andrade at PSI Agency Inc. to inspect, among other items, the Building's mechanical and HVAC systems.  PSI Agency's entire business model is to provide hired inspection services, promoting itself as an "affordable" option for developers.[42]

117.    On February 16, 2022, Andrade filed an "additional information" statement claiming to have inspected the HVAC system, yet conceded that "[f]inal certification is pending operational testing."[43]  Andrade also certified that "all work . . . has been performed in accordance with applicable provisions of the New York City Construction Codes and other designated rules and regulations."[44]  However, as expanded on below, the HVAC systems violated the Building and Mechanical Codes, by among other things, being improperly installed such that filters could not be accessed and failing to properly operate and maintain requisite temperatures.  Nor was the installation of the HVAC system or the construction of the ceiling plenums in which they were placed consistent with customary industry standards of workmanship.

---

[42] *PSI Agency: Affordable and Reliable Special Inspections in Order to Achieve Compliance for Your Projects Success!*, PSI AGENCY, http://www.psiagency.net/ (last visited July 14, 2025).

[43] Mauricio Andrade, *AI 1: Additional Information* 1 (Feb. 16, 2022).

[44] Mauricio Andrade, *TR1: Technical Report Statement of Responsibility* 3 (Feb. 16, 2022).

118.    This so-called "Technical Report" was filed with the DOB, allowing Alchemy to obtain a TCO for the Condominium and the Unit.

119.    Since then, Alchemy renewed its TCO for the Condominium 16 times. But this is not an accurate reflection of the habitability (or completeness) of the Building and Unit PHA.  Indeed, a proper inspection would have revealed the pervasive HVAC defects in Unit PHA.

120.    Moreover, Alchemy seems to have no intention to resolve all outstanding issues in the Building in order to obtain a FCO, and with every unit now sold in the Building, Alchemy appears to be teeing itself up to bank its profits and move on to a new project without completing the necessary work to obtain the FCO for buyers.  In fact, Alchemy has not received a FCO for at least nine buildings it lists as "complete" on its website.

## VII.    Alchemy's Fraudulent Representations Induce Plaintiffs to Enter a Purchase Agreement for Unit PHA.

121.    On June 7, 2023, Plaintiffs entered into a purchase agreement (the "Purchase Agreement") in connection with the purchase of Unit PHA for $24,750,000 and a corresponding parking space for $550,000.  The Purchase Agreement explained that the Offering Plan "is incorporated herein by reference and made a part hereof with the same force and effect as if set forth at length. In the event of any inconsistency between the provisions of this Agreement and the Plan, the provisions of the Plan will govern and be binding."[45]

---

[45] Purchase Agreement at 1.

122.   Upon executing the Purchase Agreement, Plaintiffs paid a deposit of $3,093,750 for the Unit, plus another deposit of $68,750 for the parking space.

123.   Plaintiffs executed the Purchase Agreement based on Alchemy's various representations and assurances regarding the luxury construction and design of Unit PHA in its Offering Plan and Marketing Materials.  Plaintiffs were made to believe that Unit PHA would be move-in ready, with premium finishes, meticulous craftsmanship, and a level of design and quality consistent with luxury living, and they relied on these representations when making the significant financial and personal decision to buy the Unit.

124.   Before closing, Plaintiffs and their representatives were given only a brief and superficial tour of the Unit at the initial walkthrough, as discussed further in paragraphs 126–128.  The presentation was curated and controlled, showing only select aspects, while concealing or failing to reveal any of the underlying defects.  The Plaintiffs, who are not construction experts, had no reason to suspect the several latent defects hidden beneath the surface and were otherwise assured that any visible defects identified during the walkthrough would be easily fixed.  Plaintiffs had no meaningful opportunity to inspect the HVAC system in any depth, and Alchemy took no steps to correct any false or misleading statements made about Unit PHA's quality of HVAC system.

125.   In reliance on these statements and representations from Alchemy, Plaintiffs closed on Unit PHA on July 11, 2023.  At that time, Plaintiffs fully performed their obligations under the Purchase Agreement to complete their

purchase of the Unit, including remitting the balance of the purchase price, plus other common charges and fees negotiated between the parties. Furthermore, Plaintiffs— under the belief that there were no significant issues with their Unit—moved forward with hiring interior designers and contractors and purchasing custom furniture, which were significant costs on top of the purchase price for Unit PHA. However, the latent defects soon started to reveal themselves, and the costs quickly shifted away from design and remodeling costs and towards remediation costs to make habitable what they believed to be their new home.

## VIII.  The Defects Begin to Reveal Themselves.

126.  Before closing, Plaintiffs' real estate broker, Michael Carroll, completed a walkthrough of the Unit with ProHome LLC ("ProHome"), a company providing warranty management services for residential builders and developers, hired by Alchemy. Plaintiffs had requested a proper home inspection, rather than simply a walk-through with ProHome, but Alchemy refused.

127.  During the walkthrough, Mr. Carroll and ProHome recorded all obvious defects in an initial punch list (the "Punch List"), which was approved on June 15, 2023.

128.  The Punch List identified 62 defects that were immediately apparent upon a walkthrough of the Unit. These defects included electrical issues, dents and holes in the walls, and deep scuffs and scratches in the floors.

129.  Mr. Carroll was unable to detect severe latent defects at the time of the walkthrough, as these issues were concealed and not immediately observable. Plaintiffs began to uncover defects soon after moving in, including HVAC failures,

pervasive noises, and serious window deficiencies that had been obscured by reflections from the sun at the time of the initial walkthrough.  In particular, the inoperable HVAC systems and pervasive noises rendered Unit PHA uninhabitable.

### A.    Unit PHA Lacks Heating and Cooling.

130.    On July 12, 2023, ***the day after closing***, Plaintiffs discovered that the HVAC system in Unit PHA failed to function.  At first, Plaintiffs believed that this was a minor technical issue, and thus asked the Condominium's then Superintendent, Kester Langhorne, to help them fix the problem.

131.    Furthermore, over the next few days, Plaintiffs noticed that the HVAC units would encounter various error codes and shut themselves down multiple times per day—each time consuming much energy (and generating heat) as it tried to reboot and turn back on. In the few rooms that they were operating, the HVAC units were always running regardless of the thermostat setting.

132.     On July 19, 2023, one week after closing, Plaintiffs were required to vacate their Unit due to the defective HVAC system and temperatures exceeding 90° F—a circumstance that would recur several times over the ensuing months.

### B.    Loud Mechanical Noises and Vibrations Permeate Unit PHA.

133.    Around this time, Plaintiffs also discovered that the Unit suffered from persistent noise issues.  The noise issues took three forms.

134.    First, the malfunctioning HVAC system caused all the HVAC vents to rattle uncontrollably, emitting constant intolerable noises into a unit that Alchemy previously described as a "sanctuar[y]" and "an oasis of comfort."

135.    Second, the Unit suffered from a constant low-frequency noise that permeated the Unit.  Plaintiffs discovered the source of this noise was from the HVAC system located in Bedroom 4.  The HVAC unit was installed to create a deep rumbling sound that physically shook the walls of Bedroom 4, recreating the effect of a broken subwoofer found in a movie theater—a constant, throbbing, deep tone sound.  For weeks, Plaintiffs suffered through the sound, finding it increasingly irritating and intolerable.  And it was no wonder the sounds were aggravating:  studies have shown that, over time, exposure to such persistent low-frequency noises is a powerful stressors for humans, which can lead to decreased heart rate variability and increased stress and hypertension.  Alchemy had quite literally sold Plaintiffs a home that *increased* stress—not an "oasis of comfort."

136.    Finally, Plaintiffs also realized that the elevator systems outside the Unit would cause loud, metallic clanging sounds—sounds that reverberated throughout the Unit at volumes far louder than was reasonable.

### C.    Unit PHA's Windows Are Tainted.

137.    The promised "crazy, cinematic views" also fell short:  among other defects, nearly a dozen of Unit PHA's windows were pitted, blighted with burn marks

-44-

and rust embedded in the glass.



138.    Plaintiffs originally were unable to see many of these blemishes due to sun reflections on the windows during their walkthrough. Yet Plaintiffs were soon faced with the reality that their views of the city were going to be diminished by the many blemishes.

**D.    Essential Building Services Terminate Inside Unit PHA.**

139.    Plaintiffs' suffering from Unit PHA's defects was soon compounded by a persistent invasion of their privacy.

140.    In August 2023, Building staff requested Plaintiffs grant them access to Unit PHA because one of the hot water valves needed to be shut off in order to perform work in a completely different unit.  Plaintiffs subsequently reached out to Alchemy for clarification on why a valve serving another unit was located within Unit PHA and requested as-built diagrams to determine whether other common controls were similarly situated within the Unit.  Alchemy responded that "it is possible that there are building systems that require infrequent access inside the unit."

141.    This too was false and misleading.   In reality, Alchemy improperly constructed the Condominium such that several mechanical systems terminated inside Unit PHA.  As a result, maintenance staff are required to frequently access Unit PHA to perform work unrelated to Unit PHA.  This deviates significantly from any representation that Building staff would require "infrequent" access, and falls well short of the "oasis" that Alchemy promised to deliver.[46]

142.    Moreover, Plaintiffs soon learned that Alchemy installed not just one service affecting one other unit inside of Unit PHA, but rather valves serving ***17 other units***.  Between July and August 2024, Building workers required access multiple times to Unit PHA to "bleed the riser," a process to address hot water delays in other Condominium units.   Coincidentally enough, one of the unit owners complaining of a lack of hot water was Mr. Horn himself—who reputedly was "losing his mind" over the hot water issues plaguing his unit several floors below.

143.    In fact, over these two months, Plaintiffs documented that workers spent more than 30 hours inside Unit PHA bleeding the risers (shafts or pipes that run up through multiple floors, serving as a conduit for various services) for other units.   During this process, workers routinely left Plaintiffs' front door wide open,

---

[46] Alchemy's design decisions also included code-violative shortcuts.  During an FDNY fire safety inspection in 2024, Plaintiffs learned that Alchemy and LBG failed to install a mandatory fire sprinkler pressure gauge required to address any potential fires in the trash chute.  And because they failed to install this necessary gauge during construction, Plaintiffs had to coordinate with multiple contractors and participate in the destruction of an entire wall inside Unit PHA, so the contractors could root around for the relevant water pipe to install the gauge.  This invasive process also required Plaintiffs to again vacate their home, demonstrating how Alchemy's shortcuts rendered the home incomplete for any comfortable habitation.  Perversely, Orsid—the Condominium's property manager—tried to lay blame on Plaintiffs and impose all costs to remediate Alchemy's failure onto them.

running a water hose through the Unit and into the ceiling to release air trapped in the Building's riser system. Each attempt to bleed the riser took approximately three and a half hours per visit, and involved both the Condominium's staff and unknown contractors, who were often left alone inside the Unit.

144. To better understand their situation, Plaintiffs asked Mr. Langhorne to explain which Building services terminated in Unit PHA. Mr. Langhorne told Plaintiffs that he believed all Building risers terminated inside of Unit PHA. However, Mr. Langhorne was unable to answer where in Unit PHA these services terminated because Alchemy did not have as-builts that matched the finished product in most cases. He, along with the rest of the Condominium's staff, could not locate anything with confidence based on the available construction plans.

145. Even apart from the July to August 2024 riser-bleeding debacle, Building staff and outside vendors required access inside Unit PHA and its exclusive-use commons over *50* times since December 2023 to service other parts of the Building. These requests involved needing access to service various critical mechanical, structural, electrical, and plumbing systems in the Building. Rather than locating these services in a hallway mechanical closet, Alchemy made the conscious decision to design the Building in such a way that these services could only be accessed by going through Unit PHA and its exclusive-use commons.

146. When access was required, Plaintiffs were usually provided with little or no notice before staff and outside vendors entered their Unit. On several occasions,

vendors were found walking freely through parts of the Unit to which no access was needed.

147.    Rather than being a sanctuary in the city, Unit PHA has been used as a building-maintenance thoroughfare for nearly two years—all due to shoddy construction work directed by Alchemy. Plaintiffs have been forced to be the gatekeeper to all vital, ordinary, and necessary Building services, with the associated pressure to drop everything and allow work crews inside their home, lest the Building or other occupants suffer as a result of any delay.

148.    Although Alchemy designated areas that require **weekly** access as "**exclusive-use** commons" in the Offering Plan, they are far from exclusive—another misrepresentation from Alchemy that adds to the inaccuracy behind what it sold to Plaintiffs.

## IX.    Alchemy Acknowledges the Defects Yet Refuses or Fails to Make Real Progress to Resolve Them.

### A.    HVAC Defects

149.    On July 19, 2023, JDR inspected the HVAC system in Unit PHA with Plaintiffs.  JDR identified serious problems with its installation of the HVAC units, which had never been disclosed to Plaintiffs.  Specifically, JDR confirmed that when installing the HVAC in Unit PHA, it knew that the air filtration system could not treat air in the top floor of the Unit.

150.    JDR and Plaintiffs also found that the HVAC system had significant hardware defects.  On the units that operated (even if not as intended), the metal covers intensely and incessantly rattled, whether from attempting to handle a load

meant to be dispersed across all the HVAC units, improper installation, or otherwise. Various of the system's defects caused yet more problems—including excessive condensation and substantial water leaking into, and warping, the Unit's ceilings.

151.    Additionally, a fan motor of the HVAC system was improperly installed directly behind a return vent, a mistake that caused the system to serially overheat, display error codes on the thermostats, and shut down.

152.    Over the next several months, Plaintiffs tried to work with Alchemy and its contractors to determine what was wrong with the HVAC units in Unit PHA.  But neither Alchemy nor its vendors could properly diagnose the issues—often contradicting themselves in successive visits.  Unable to find a permanent fix, Alchemy and its vendors resorted instead to stop-gap solutions that never resolved PHA's HVAC problems.

153.    For instance, Alchemy and JDR, rather than proposing a real solution to the HVAC condenser leaks, ultimately decided that they would merely place drip pans under the condensers.  That band aid was insufficient to address even the symptom; water continually accumulated in the pans at a rate exceeding that of evaporation, and the resulting overflow damaged the ceilings one drip at a time.

154.    Alchemy acknowledged on July 27, 2023 that it installed defective HVAC units throughout the Condominium.  But Alchemy and its contractors never provided a complete solution to replacing the system.  Replacing the HVAC units— or at least replacing the faulty FCU motors causing the whirring and squeaking sounds from the HVAC—would have required various types of contractors to remove

the systems from their poorly-installed locations.  But Alchemy never brought in the right teams to do so, or took any other action over the ensuing months to address the excessive noise.[47]

155.   By August 2023, the HVAC problems made the Unit so uninhabitable that Plaintiffs were forced to vacate the Unit entirely.

156.   The Unit remained uninhabitable in September 2023.   The HVAC system either did not work at all or operated at less than full capacity for brief intervals before continually shutting down.  When Alchemy had Samsung come to Unit PHA to see if its representative could solve the issue, the Samsung representative encountered error codes but offered no solution other than "resetting" the system.  That proved ineffective.

157.   By December 2023, however, Alchemy declared the remediation work it had directed to be complete, and the HVAC system operational.  By that point, Plaintiffs had effectively been cast out of the Unit for four months.  Yet, when they returned on December 7, 2023 to inspect the remediation work, the heat did not work—they came "home" to the freezing cold.  Specifically, the HVAC system would function at less than the intended capacity for a short time; encounter a critical error; and shut itself down.  The loop repeated multiple times per day, and the Unit could never reach (much less maintain) a temperature suitable for the indoors.  The change

---

[47] Eventually, Unit PHA was offered replacement FCU motors in December 2023.  However, Alchemy failed to follow through with its promise until March 2024 and even then failed to address the myriad installation errors.

in seasons had solved nothing, the heat just as defective as the air conditioning.  The Unit remained uninhabitable, and Plaintiffs were once again forced to vacate.

158.    In January 2024, JDR and LBG again attempted to fix the HVAC system, this time by tearing down parts of the ceiling to replace assertedly defective valves within the HVAC units.  Like those that came before, those repair efforts failed.  When Plaintiffs returned to Unit PHA later that month, whatever the supposed "fixes" did, they did not cause the HVAC system to heat the Unit—despite promises to the contrary by JDR and Alchemy.  The HVAC thermostats still were showing numerous error codes. At this point, Alchemy had acknowledged that the HVAC issues were "pervasive and constant" and "obviously a systemic issue," but it continued to allow JDR to guess and repeatedly fail at identifying the issues, rather than forcing it to fully replace the entire HVAC system.

159.    Later that month, Alchemy and JDR offered yet another new theory: that the water temperature levels were too low, and they would have to reroute the water lines on all of the HVAC condensers in Unit PHA to prevent them from shutting down.  Thus, on January 21, 2024, JDR rerouted the water lines, and then left without testing or turning on the heat.  The HVAC system broke down the next day.  Upon later inspection, JDR realized that when it rerouted the water lines, they failed to install the valves needed to accommodate the directional change.

160.    Next, JDR thought that the HVAC condensers were overcharged with improper refrigerant levels.  It replaced the refrigerant and said it had ensured that there were no error codes and no heating issues.  Yet that same day, error codes

continually popped up, and the heat did not function anywhere in the Unit. It would later be revealed that JDR had been guessing at the proper amount of refrigerant to use in the HVAC condensers since it had no as-built diagrams that documented the proper refrigerant amounts.

161.    JDR also hired ALED Technologies Inc. ("ALED") in January 2024, an HVAC contractor that it hires when it cannot resolve a problem itself. ALED informed Plaintiffs that JDR improperly crossed refrigerant pipes in the walls and ceilings when it installed the HVAC, which caused the condensers to shut down to prevent overheating and damage. Yet ALED shifted its stated diagnosis a week later, insisting that the issue was actually crossed wires, not crossed pipes. Plaintiffs later learned that an LBG worker observed JDR, in the Building's common area conference room, urge ALED to change its stated diagnosis before meeting with Plaintiffs because the originally offered diagnosis was "going to be significant work."

162.    By this point, Alchemy and its contractors had not solved Unit PHA's defects in months, and created only more problems along the way.

163.    Consequently, in February 2024, Plaintiffs notified Alchemy that no one associated with Alchemy would be further allowed in Unit PHA due to their failure to make any progress in fixing the HVAC issues since July 2023, instead pivoting from one attempted cheap-and-easy—and unsuitable—"fix" to another, each accompanied by falsehoods aimed to appease.

164.    From the time Plaintiffs first experienced the symptoms of the HVAC defects in the days after closing on their Unit, the HVAC system has remained

completely dysfunctional. Alchemy disclosed none of the defects to Plaintiffs before they closed on the Unit, and Plaintiffs, as a result of these defects, have been unable to reside in their Unit other than intermittently during temperate portions of the year. The HVAC issues described above violate several provisions of New York City's Building and Mechanical Codes, among others.

### B.    Elevator Noise Defects

165.    Alchemy also failed to take any significant steps towards remediating the elevator noise defects.

166.    While Alchemy acknowledged back in July 2023 that the elevators made clanging and snapping noises that emanated from the top portion of the elevator shaft and were audible inside the Unit, it made no attempt to resolve this issue. In September 2023, Alchemy had Fujitec, its elevator and service provider, attempt to adjust the brakes; however, these "adjustments" ultimately did nothing to improve the clanging sounds heard throughout the Unit. Alchemy then assertedly spoke with two engineers on possible solutions. One recommended an acoustic lining to go inside the elevator shafts to dampen the noise. Yet Alchemy never followed through on this recommendation.

### C.    Window Defects

167.    Alchemy also acknowledged that numerous windows were delivered damaged, and replacement windows would be ordered and arrive within a few months. But in a failed attempt to remedy the window defects, Alchemy and Skyline replaced the original defective windows with new defective windows that exhibited

fogginess and frosted streaks between the glass layers. Especially on sunny days, the replacement windows were hazy in nature.

168. Plaintiffs' windows have yet to be replaced, and Plaintiffs learned that part of this delay was due to Alchemy's failure to timely pay Skyline for past glass windows and installation services.

## X.    Plaintiffs Hire Consultants to Diagnose the HVAC and Noise Issues.

169. Due to Alchemy's complete failure to address these systemic defects, Plaintiffs was forced to hire consultants to diagnose these issues at significant personal expense.

### A.    HVAC Investigation

170. Plaintiffs hired Dezier Air, reputable HVAC consultants that Alchemy recommended that Plaintiffs use, on February 28, 2024. Dezier proceeded to investigate the root causes of the problems Plaintiffs suffered. Only then did the magnitude of Defendants' fraudulent conduct come to light: Dezier identified significant and systemic defects that compromised the HVAC system's functionality, safety, and overall efficiency and violated New York City's Building and Mechanical Codes. In short, all the representations made by Alchemy about the quality of the Building, its compliance with relevant building codes, and the sophistication and convenience of its HVAC systems were discovered to be false.

171. To start their investigation, Plaintiffs' contractor and HVAC consultants were forced to cut into the sheetrock in many of Unit PHA's rooms to discover the root causes of the various issues Plaintiffs suffered. Through that process, Plaintiffs

learned for the first time the magnitude of Alchemy's and its contractors' installation errors.

172.    First, Plaintiffs' HVAC consultants determined that many of the individual HVAC mechanical units were completely inaccessible.  Like the other units noted above, Unit PHA's HVAC units were installed without access panels to maintain the units and swap out filters in violation of New York City's Mechanical Code.  Additionally, in two locations, plumbing or sprinkler pipes were installed in a manner that prevented repair and maintenance access to the HVAC units.   This faulty installation and lack of proper access panels makes the Offering Plan representation that the filters will need to be cleaned and changed on a regular basis materially false and misleading.  In short, what Alchemy misrepresents is that, to perform routine (and regular) maintenance of the HVAC units, unit owners were required to perform construction work:   cutting into the sheetrock of the unit's ceilings and walls.[48]



---

[48] That renders Alchemy's caution that "[t]he maintenance and repair of the heating and air conditioning unit are the responsibility of each owner," who should "[c]heck [their] filter on a monthly basis to determine if it is dirty or clogged" all the more beguiling.  Alchemy did

173.  Second, cutting away the sheetrock revealed Alchemy's and LBG's construction errors with respect to sealing off the ceiling plenums. Not only could the HVAC systems not recirculate air properly, the HVAC units also were installed in tight corners that rendered it impossible for those systems to work properly.



174.  Third, unlike Alchemy's various contractors (including the Samsung representatives it brought in), Plaintiffs' consultants undertook to diagnose the various error codes the Samsung thermostats would display whenever the system operated.   The HVAC system routinely shut itself down and showed some combination of Error Codes 407, 410, 435, 436, 416, and 152.  Error Codes 407 and 410 indicate that the system has shut down due to its high-pressure safety mechanism being triggered. This happens when the refrigerant pressure in the system exceeds a safe limit, potentially damaging the compressor or other components. Error Code 435 indicates a problem with the evaporator coils freezing, which can happen when the airflow is restricted, the evaporator coil is dirty, or there

_____

precisely what it cautioned unit owners not to do: "cover or box in [their] heating or cooling equipment." *See* 378 West End Avenue Homeowners Information Booklet at 8.

is a low refrigerant charge. Error Code 436 indicates the system is shutting down to prevent the heat exchanger from freezing. Error Code 416 indicates that the compressor discharge temperature is exceeding the system's design limits. Error Code 152 indicates operational failure of the electronic expansion valve. The HVAC system's inability to maintain proper temperatures was a violation of the Building Code and Mechanical Code.

175.   Dezier also determined that the HVAC system was both undercharged and overcharged with dirty and incorrect refrigerant volumes that compromised the integrity of the heat exchangers and compressors. This caused further system damage.

176.   Furthermore, the air handlers exhibited excessive levels of dust and dirt accumulation, which affected the system's efficiency and increased the risk of electrical leakage, shorting, and failure. There were also many instances of spliced wiring within the system's communication network, which presents a significant risk of malfunction due to compromised signal integrity, and also raises safety concerns given the resulting electrical hazards. The spliced wiring is also a violation of New

York City's Electrical Code.



177.    Dezier also discovered a critical installation error with the setup of the water supply and return lines to the condensers. Alchemy's contractors erroneously installed the supply lines where the return lines should be, and vice versa. This erroneous crossing caused the condensers to shut down from incurring further damage and affected the system's efficiency and led to premature wear of the condensers.

178.    Fourth, as noted above, Dezier and Plaintiffs' contractor discovered that even routine maintenance was severely hindered by Alchemy's and LBG's installation of the system. Critical components, including air handlers and condensers, were simply inaccessible, and the absence of necessary access panels and the installation of pipes in front of HVAC units, have complicated even the most basic maintenance

tasks. This renders false and misleading Alchemy's admonishment that "[t]he maintenance and repair of the heating and air conditioning unit are the responsibility of each owner." In fact, a construction team was required to access the HVAC system. Likewise, Alchemy's Offering Plan—as noted above—even stated that unit owners must access and clean their HVAC filters on a yearly basis. They could not do so. This is further a violation of the Mechanical Code.

**B.    Noise Investigation**

179.    Plaintiffs also hired an audio engineer to assess the noise issues throughout Unit PHA. The audio engineer found that sound levels from the elevators and HVAC units violated New York City's Noise Code.

180.    The elevator banging in the 500 hertz frequency range is the loudest in the three exclusive-use common areas of Unit PHA. In those areas, the bangs reach 66 decibels. In the bedrooms, the bangs reach 44 decibels. In the bathrooms and entranceways, the bangs reach 45 decibels. The audio engineer explained that across all these areas, the elevator bangs ranged from 7 to 32 decibels above the ambient sound in the same area. An increase of 10 decibels is subjectively perceived as a doubling of sound. A 32-decibel sound-level increase is nearly 900% louder to the human ear than the ambient level. The World Health Organization has designated such decibel levels "noise pollution." These occurrences of impulsive sound are per se "unreasonable" under, and in violation of, the Noise Code.

181.    Plaintiffs also discovered that there are no isolation pads under the elevator controller racks, which are typically installed to reduce noise, vibration, and shock transmission from the elevator machinery to the building structure. This is

especially relevant because in the areas of the Unit furthest away from the elevators, the noise pollution is heard through the Building's foundational beam vibrations rather than the audible clanging which can be heard closer to the elevators.

182.    In the third-floor exclusive-use commons, there are constant air rushing noises persisting at 53 decibels, unreasonably exceeding the sound limitations outlined in the Noise Code.

183.    The audio engineer also determined that there were unreasonable noise levels in Bedroom 4 stemming from the HVAC system installed in the room's walls. When turned on, the HVAC system created a low-frequency, pure-tone hum that physically shook the walls, lasting approximately 60 seconds and measuring as high as 72 decibels.  The audio engineer found that when the HVAC condenser called for cooling, the compressor inside the unit vibrated, shaking two large copper pipes, which in turn shook the wall of the bedroom and created the low-frequency pure tone. A pure tone—since it only consists of a single frequency—is unnatural, attention-getting, and penetrating.  This type of noise and its effects made it impossible to sleep in this bedroom and unreasonably exceeded the sound limitations outlined in the Noise Code.

## XI.    Alchemy Unreasonably Prevents Plaintiffs from Fixing the Defects.

184.    Following the diagnostic reports from the HVAC consultant and audio engineer, Plaintiffs retained a general contractor to remediate the significant defects in the Unit.

185.    The general contractor, who others in the Condominium had relied on for their own homes, was going to perform a complete overhaul of the HVAC system.

Unlike Alchemy, Plaintiffs' contractor was going to ensure that return paths were installed where absent; install ducted returns or ensure open return air paths based on site conditions; redo all communication wiring according to manufacturer specifications; correct any malpractice in piping; flush all refrigerant lines to remove contaminants; pressure test existing piping to ensure integrity; modify water supply and return lines for the condensers for improved operation and serviceability; and relocate condensers for easier access and maintenance.

186.     In August 2024, the general contractor was able to replace the FCU motors, which were heavily encrusted with construction and drywall debris.

187.     While the general contractor was able to **begin** remediation work, all remediation work has now been halted.  Alchemy and the Board of Managers have refused to permit remediation work without Plaintiffs signing an Alteration Agreement that required Plaintiffs to broadly release not just the Board of Managers, but **Alchemy** too.

188.     If Plaintiffs had executed the Alteration Agreement as presented, they would have been at risk of releasing Alchemy of any and all liability—including liability for the costs of repairing the latent construction and installation defects in the $24,750,000 Unit.  It is unconscionable to insist that the defects for which Alchemy is responsible cannot be fixed unless Alchemy is held harmless for its own misdeeds.

189.    Even so, given their commitment to complete the remediation work, Plaintiffs proposed to the Board of Managers an addendum (the "Addendum") to the Alteration Agreement that aimed to remove any release of Alchemy.

190.    On December 23, 2024, however, Plaintiffs learned from Adam Densky at Orsid that the Board of Managers summarily rejected the proposed Addendum and declined further comment.  When Plaintiffs subsequently reached out to Alchemy for its assistance with facilitating the Board of Managers' agreement to remove the release of Alchemy, Alchemy stonewalled Plaintiffs and represented that it was not and is not involved in any decisions regarding the Alteration Agreement.

191.    But this was not true.  Mr. Densky revealed to Plaintiffs that Alchemy and Mr. Breitkopf—who served on the Board of Managers at the time—spearheaded efforts to reject the Addendum and thus block any progress with Plaintiffs' efforts to diagnose and remediate the Unit's defects.

192.    Even after sending Alchemy a litigation hold to preserve documents in April 2024, Plaintiffs endeavored for more than a year to handle this cooperatively. However, Plaintiffs' efforts to negotiate a resolution have fallen on deaf ears.

193.    Alchemy has been playing a shell game aimed at—and succeeding in— halting Plaintiffs' efforts to diagnose and remediate latent defects that Plaintiffs raised, and Alchemy admitted to, over a year ago.  In the face of Plaintiffs' good faith efforts to resolve these issues collaboratively, Alchemy opted to obscure and impede.

194.    At this point, after purchasing what they believed to be a luxury condominium unit for $24,750,000, Plaintiffs have barely had a chance to live in their

new home, and Alchemy appears intent on stalling any progress to remediate its defective construction.

## XII.    Alchemy's History Is Repeating Itself.

195.    That Alchemy's words are contradicted by its actions is nothing new.

196.    At a May 19, 2025 Condominium meeting, Mr. Horn—sitting both as a Condominium unit owner and as Alchemy's owner—claimed Alchemy has never received complaints for its work from its customers.[49]   As his website proclaims, Alchemy's "success lies in [its] control of all facets of a project from acquisition to conclusion."[50]   For Alchemy, its "reputation" and "word" are "infinitely more important than any transaction or negotiation."[51]

197.    Under this facade of morality, Alchemy also markets that "strong returns for [its] partners and investors" and "[p]reservation of capital" are the ultimate goals, and "emphasized at every point in an asset's investment cycle."[52] That's the truth:  Alchemy is more concerned about turning a profit than building structurally sound and operative buildings.

198.    While Alchemy claims that its "dealings with partners, lenders, vendors, neighbors, tenants, sellers and buyers are conducted with the highest integrity,

---

[49] Mr. Horn's claim is astonishing, given that a substantial portion of the meeting prior to his remarks concerned complaints about the Building—including Alchemy's failure to replace defective FCUs for unit HVAC systems.

[50] *Overview*, *supra* note 28.

[51] *Id.*

[52] *Id.*

respect, moral and ethical standards,"[53] Alchemy has been named in no less than 19 lawsuits in the past two decades brought by those very neighbors, buyers, and workers of its partners and vendors.   These lawsuits stem from improper safety equipment and unsafe working conditions for workers; unsafe premises for tenants and owners; failure to pay commission to a broker; damage to neighboring buildings during construction; and ***construction defects in a luxury condominium building***.

      a.    Improper Safety Equipment and Unsafe Premises for Workers

          i.    *Alvando Fernandes Costa v. 125 West 57th Street Property Owner, LLC et al.*, No. 0153083/2024 (N.Y. Sup. Ct. Apr. 3, 2024).

          ii.    *Jesus Sosa Gonzalez v. 378 WEA Owner, LLC et al.*, No. 0814840/2021 (N.Y. Sup. Ct. Nov. 1, 2021).

          iii.    *Alex Garces v. 800 Tenth Ave Developer, LP et al.*, No. 0728169/2021 (N.Y. Sup. Ct. Dec. 22, 2021).

          iv.    *Rodrick Moore v. Woolworth 100 Owner, LLC et al.*, No. 162496/2019 (N.Y. Sup. Ct. Dec. 27, 2019).

          v.    *Carlo De Giacomi v. 233 Broadway Borrower, LLC et al.*, No. 162068/2019 (N.Y. Sup. Ct. Dec. 13, 2019).

---

[53] *Id.*

    vi.    *Ever Hernandez v. Board of Managers of the Noma Condominium et al.*, No. 509237/2018 (N.Y. Sup. Ct. May 4, 2018).

    vii.    *Manuel Rivera v. AGA 15th Street, LLC et al.*, No. 159395/2016 (N.Y. Sup. Ct. Nov. 8, 2016).

    viii.    *Hugo Zuazo v. Xavier High School et al.*, No. 0000596/2017 (N.Y. Sup. Ct. Nov. 30, 2017).

    ix.    *Danny Popovski et al. v. 340 Court Street, LLC et al.*, No 162293/2014 (N.Y. Sup. Ct. Dec. 12, 2014).

    x.    *Carolos Daniel Rodriguez v. Alchemy Properties, Inc.*, No. 0101923/2011 (N.Y. Sup. Ct. Feb. 16, 2011).

    xi.    *Jorge Saguay v. Eastside 77 Associates, LLC et al.*, No. 0112783/2009 (N.Y. Sup. Ct. Feb. 19, 2010).

b.    Unsafe Premises for Tenants and Owners

    i.    *Mary-Kate McLaughlin v. Alchemy Properties, Inc. et al.*, No. 0063189/2022 (N.Y. Sup. Ct. Apr. 28, 2023).

    ii.    *Stefan Bondell v. Jude Quintiere et al.*, No. 154902/2014 (N.Y. Sup. Ct. May 19, 2014).

c.    Failure to Pay Broker Commission

    i.    *Brian Kanarek v. Alchemy Properties, Inc. et al.*, No. 650137/2016 (N.Y. Sup. Ct. Jan. 12, 2016).

d.    Damage to Neighboring Buildings During Construction

     i.     *Three Branches Properties, LLC v. Alchemy Properties, Inc. et al.*, No. 652614/2013 (N.Y. Sup. Ct. July 25, 2013).

     ii.     *B. Brages Associates, LLC v. 125 West 21st, LLC et al.*, No. 0114320/2009 (N.Y. Sup. Ct. Jan. 13, 2010).

     iii.     *Courtney Associates v. 50 West 15th, LLC et al.*, No. 102815/2006 (N.Y. Sup. Ct. Mar. 1, 2006).

     e.     Construction Defects in Luxury Condominium Building

     i.     *John S. Chrysikopoulos v. Soho Green Associates, LLC et al.*, No. 109881/2002 (N.Y. Sup. Ct. May 14, 2002).

199.    Indeed, Alchemy's conduct here repeats the same playbook it executed in *Chrysikopoulos v. Soho Green Associates*. There, Alchemy and Mr. Horn converted 20 Greene Street into purported "luxury" condominiums. Defendants marketed and sold the development as "luxury" condominium units to unsuspecting buyers who paid millions of dollars per unit.[54]

200.    Unsurprisingly, these units were riddled with the same problems Plaintiffs seek to remedy by this lawsuit, including, but not limited to, ventilation issues.[55] Mr. Horn repeatedly assured owners he would repair these issues but failed to follow through on his promises. For example, Mr. Horn failed to address ventilation issues at 20 Greene Street for at least one year despite more than half a

---

[54] *Id.* at 5.

[55] *See* Cross-Mot. for P. Summ. J., Ex. C, *Chrysikopoulos v. Soho Greene Associates, LLC*, N.Y. Sup. Ct. (2004) (No. 109881-02).

dozen complaints from owners[56] and promises "to complete all open items as promptly as possible."[57]

201.    When the *Chrysikopoulos* plaintiff finally sued Alchemy, Mr. Horn, and others, the New York Supreme Court declined to dismiss claims against Alchemy, which ultimately led to an undisclosed settlement.

202.    As a result of cutting corners to save time, effort, and money, Alchemy has compromised the quality of its buildings and put its buyers, neighbors, and workers at risk of extensive physical and economic injuries. It is far from a company that conducts itself "with the highest integrity, respect, moral and ethical standards."

## COUNT I

### Violation of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1703(a)(2), 1709
(Against Alchemy and Kenneth Horn)

203.    Plaintiffs repeat and reallege the facts set forth in paragraphs 1–202 above as though fully set forth herein.

204.    Alchemy and Mr. Horn developed Unit PHA and deeply embedded themselves in the construction and marketing of the Unit from start to finish.

205.    Alchemy and Mr. Horn, with respect to the sale or offer to sell Unit PHA, employed a device, scheme, or artifice to defraud; obtained money by means of untrue statements of material facts; and engaged in practices which operated as a fraud upon Plaintiffs.

---

[56] *Id.* at 5, 10, 17, 21, 26, 38, 57.

[57] *Id.* at 47.

206.    Alchemy and Mr. Horn published and disseminated Marketing Materials, which promised, among other things, a grand luxury condominium, as is set forth more fully in paragraphs 101–104.  Additionally, Alchemy and Mr. Horn falsely stated and represented to Plaintiffs in the Offering Plan, as set forth more fully in paragraphs 69–70 above, that the Building was constructed in accordance with the Plans and Specifications and all applicable zoning and building laws, regulations, codes, and other government requirements, and that unit owners would be responsible for maintaining, cleaning, and repairing their HVAC units on a regular basis.  Alchemy and Mr. Horn also represented that they had no knowledge of any material defects or need for major repairs in the Building or units therein.  The Certification Mr. Horn signed represented that the Offering Plan did not, among other things, contain any untrue statement of material fact.

207.    These statements and representations described above were false and made to fraudulently induce Plaintiffs to enter into the Purchase Agreement.  The Building and Unit PHA were improperly and inadequately designed and constructed, and they were completed in an incompetent and unworkmanlike manner, with material design and construction defects, as addressed in paragraphs 76–100 and 126–183 above, all substantially below applicable standards for a first class, luxury condominium building.  The HVAC system has been completely dysfunctional since at least the date of closing—and likely for over a year before.  The Unit has suffered from unreasonably loud clanging from the elevators and pure-tone hum noises that emanate from the HVAC units and send vibrations throughout the Unit, and many

-68-

windows are severely defective, exhibiting pitting, chemical damage, burn marks, and squiggly lines from end to end that cause the glass to haze in the sunlight. The Building and Unit PHA are also not in accord with the Offering Plan and applicable building laws, regulations, and codes, all as more particularly alleged above.

208.    Alchemy and Mr. Horn made use of instrumentalities of interstate commerce, including mailing, electronic mail, and internet communications to Plaintiffs in furtherance of its scheme to defraud. Furthermore, Plaintiffs are based in New Hampshire and Alchemy is based in New York.

209.    Moreover, the sale of Unit PHA is not exempt from ILSFDA under Section 1702(a)(2) because the Unit was not complete at the time Plaintiffs executed the Purchase Agreement.  The Unit was not, and still is not, physically habitable and usable for the purpose for which it was purchased, and it did not have all the necessary and customary utilities extended to it in working condition.  The HVAC system never properly worked, and still does not work, making it entirely uninhabitable in New York City.  Additionally, none of the purchasing documents mandated Alchemy to complete the Unit by a specific time.

210.    By reason of the foregoing, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial, in no event less than $75,001.

## COUNT II

### Breach of Contract
(Against Alchemy)

211.    Plaintiffs repeat and reallege the facts set forth in paragraphs 1–210 above as though fully set forth herein.

212.   Plaintiffs and Alchemy entered into a Purchase Agreement for the Trust to purchase Unit PHA in the Building.   The Purchase Agreement, by its terms provided, among other things, that all the terms and conditions in the Offering Plan were incorporated therein.   The Purchase Agreement and Offering Plan are valid and enforceable agreements, and all conditions precedent, if any, to their enforcement have been satisfied.

213.   The Offering Plan provided, among other things, that Alchemy would comply with all obligations imposed by the Offering Plan, approved building Plans and Specifications, applicable statutes and regulations, building codes and locally accepted building practices.   Alchemy would also be obligated to correct any defects in construction, or in the installation or operation of any mechanical equipment, appliances, other equipment, finishes, materials or fixtures.

214.   Alchemy breached its contractual obligations to Plaintiffs because the Building and Unit were improperly and inadequately designed, and constructed and completed in an incompetent and unworkmanlike manner, with material design and construction defects, as addressed in paragraphs 76–100 and 126–183 above, all substantially below applicable standards for a first class, luxury condominium building.   Alchemy also failed to construct the Building and Unit in accord with the Offering Plan and applicable building laws, regulations, and codes, all as more particularly alleged above.

215.    Plaintiffs fully performed their obligations under the Purchase Agreement, including closing on July 7, 2023, and tendering payment of the $24,750,000 purchase price plus applicable taxes and fees to Alchemy.

216.    Plaintiffs have been unable to live in the Unit since July 2023 because Alchemy's significant construction defects have left Unit PHA uninhabitable.

217.    By reason of the foregoing, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial, in no event less than $75,001.

218.    Alternatively, Plaintiffs seek rescission of the Purchase Agreement. Money damages alone are insufficient to make Plaintiffs whole as they have been unable to inhabit their Unit and have lost all opportunity for quiet enjoyment of their property.  Defendants have materially breached the Purchase Agreement by not providing a habitable home, and further failed to perform by refusing to make Unit PHA habitable in the years since.  Rescission of the contract would largely restore the parties to their original position, subject to other damages suffered by Plaintiffs as a result of Defendants' tortious conduct as alleged herein.  Plaintiffs have not yet received or enjoyed any of the benefits of the Purchase Agreement as a result of Defendants' conduct alleged herein.  Finally, Plaintiffs now promptly seek to rescind the contract after uncovering the extent of the fraud perpetrated to date and Defendants' steadfast refusal to address any of the issues alleged above.

## COUNT III

### Fraudulent Inducement
(Against Alchemy and Kenneth Horn)

219.    Plaintiffs repeat and reallege the facts set forth in paragraphs 1–218 above as though fully set forth herein.

220.    Since the summer of 2022, Alchemy and Mr. Horn knew or were aware of widespread construction and installation defects in the Condominium, including with respect to the HVAC systems in many of the Condominium's units.

221.    Since that time, Alchemy and Mr. Horn engaged in a scheme to continue making false representations about the quality and condition of the units in the Building in order to sell the units in the Building.  Plaintiffs were one of those purchasers.

222.    Alchemy and Mr. Horn made many affirmative misrepresentations. Alchemy published and distributed Marketing Materials for the Building and units therein, which promised, among other things, a grand luxury condominium, as is set forth more fully in paragraphs 101–104.  At the time these statements were made, Alchemy and Mr. Horn were in exclusive possession of the facts demonstrating that their representations were false.  Plaintiffs had no way of knowing that such latent defects existed at the time they relied on the Marketing Materials.  Additionally, Alchemy and Mr. Horn falsely stated and represented to Plaintiffs in the Offering Plan that the Building was constructed in accordance with the Plans and Specifications and all applicable zoning and building laws, regulations, codes, and other government requirements, and that unit owners would be responsible for

maintaining, cleaning, and repairing their HVAC units on a regular basis. Alchemy and Mr. Horn further represented that they had no knowledge of any material defects or need for major repairs in the Building or units therein. The Certification that Mr. Horn signed represented that the Offering Plan did not, among other things, contain any untrue statement of material fact.

223.    Defendants' conduct was the actual and proximate harm of Plaintiffs' injuries alleged herein.

224.    Alchemy and Mr. Horn's statements, representations, and concealments alleged above were material because Plaintiffs relied on them in deciding to buy Unit PHA.

225.    As a result of Alchemy and Mr. Horn's conduct, Plaintiffs were fraudulently induced into signing the Purchase Agreement.

226.    By reason of the foregoing, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial, in no event less than $75,001.

227.    Alternatively, money damages alone are insufficient to make Plaintiffs whole as they have been unable to inhabit their Unit and have lost all opportunity for quiet enjoyment of their property. Rescission of the contract would largely restore the parties to their original position, subject to other damages suffered by Plaintiffs as a result of Defendants' tortious conduct as alleged herein. Plaintiffs have not yet received or enjoyed any of the benefits of the Purchase Agreement as a result of Defendants' conduct alleged herein. Finally, Plaintiffs now promptly seek to rescind the contract after uncovering the extent of the fraud perpetrated to date and

Defendants' steadfast refusal to address any of the issues alleged above. What's more, on information and belief, Defendants have diverted funds from at least the 378 WEA Shell Companies, rendering those entities nominally unable to satisfy a damages award.

## COUNT IV

### Private Nuisance
(Against Alchemy)

228.    Plaintiffs repeat and reallege the facts set forth in paragraphs 1–227 above as though fully set forth herein.

229.    Alchemy has interfered with Plaintiffs' right to use and enjoy their Unit by allowing substantial and unreasonable noise from the elevators and HVAC systems to permeate Unit PHA. These noises result from shoddy craftsmanship and excessive cost-cutting measures taken by Alchemy when developing the Building.

230.    As addressed in paragraphs 133–136 and 179–183, the noise emanating from the elevators and HVAC system is substantial in nature and unreasonable in character. The elevators emit loud, anvil-hammering-like clanging noises, and the HVAC system produces unreasonably loud whooshing noises and pure-tone hums that shake the walls in one of the bedrooms. These noises and vibrations unreasonably prevent Plaintiffs from peacefully enjoying their Unit.

231.    The sound levels from the elevators and HVAC system also violate New York City's Noise Code.

232.    The elevator banging in the 500 hertz frequency range is the loudest in the three exclusive-use common areas of Unit PHA. In those areas, the bangs reach

66 decibels. In the bedrooms, the bangs reach 44 decibels. In the bathrooms and entranceways, the bangs reach 45 decibels. The audio engineer explained that across all of these areas, the elevators bangs ranged from 7 to 32 decibels above the ambient sound in the same area. An increase of 10 decibels is subjectively perceived as a doubling of sound. A 32-decibel sound level increase is nearly 9 times louder to the human ear than the ambient level (900%). This is a huge increase in sound. The World Health Organization has even designated these top decibel levels as "noise pollution." These occurrences of impulsive sound are per se "unreasonable" under, and in violation of, the Noise Code.

233. There are also no isolation pads under the elevator controller racks, which are typically installed to reduce noise, vibration, and shock transmission from the elevator machinery to the building structure.

234. The HVAC units also create substantial and unreasonable noise in the third floor exclusive-use commons and in one of the bedrooms. In the exclusive-use commons, there are constant air rushing noises persisting at 53 decibels, unreasonably exceeding the sound limitations outlined in the Noise Code. In the bedroom, there was a low-frequency, pure-tone hum which physically shook the walls, lasting approximately 60 seconds and measuring as high as 72 decibels. The audio engineer inspected the HVAC system and found that for the unit that serves this bedroom, when the condenser called for cooling, the compressor inside the unit vibrated, shaking two large copper pipes which in turn shook the wall of the bedroom, creating the low-frequency pure tone. A pure tone—since it only consists of a single

frequency—is unnatural, attention-getting, and penetrating. This type of noise and its effects made it impossible to sleep in this bedroom and unreasonably exceeded the sound limitations outlined in the Noise Code.

235.    Plaintiffs informed Alchemy about the noise issues from the elevators in July 2023.  Alchemy made no substantive efforts to resolve the noise issues. While Alchemy spoke with two engineers on possible solutions, and one recommended an acoustic lining to go inside the elevator shafts to lessen the noise, Alchemy never followed-up on its promise to install the insulation.  In July and August 2023, Alchemy acknowledged that the HVAC emitted loud noises, but then took no significant steps towards fixing such noise issues. The pure-tone hum persisted until Plaintiffs hired their own HVAC consultant to diagnose and fix the issue in August 2024—a year later.

236.    Alchemy's interference was intentional:  it knew that substantial and unreasonable noises were being produced from its subpar construction, but willfully ignored the issues, allowing such noise to continue from its failure to act.

237.    By reason of the foregoing, Plaintiffs have suffered, and will continue suffering, damage to themselves and to their property, in an amount to be determined at trial, in no event less than $75,001.

## <u>COUNT V</u>

### Breach of Fiduciary Duty
(Against Kenneth Horn, Joel Breitkopf, and Alexander Saltzman as Members of the Initial Board)

238.    Plaintiffs repeat and reallege the facts set forth in paragraphs 1–237 above as though fully set forth herein.

239.    When the Offering Plan was accepted for filing on October 8, 2020, Messrs. Horn, Breitkopf, and Saltzman were listed as members of the Initial Board.

240.    From October 8, 2020 to April 14, 2022, Alchemy and its designated board members, Messrs. Horn, Breitkopf, and Saltzman exercised complete domination and control over the affairs of the Building. Mr. Breitkopf remained on the Board as a representative of Alchemy until May 21, 2025.

241.    At all times relevant to this cause of action, as members of the Initial Board, Messrs. Horn, Breitkopf, and Saltzman were in a fiduciary relationship with unit owners, where they were required to perform their duties as board members in good faith and with that degree of care which an ordinary prudent person in a like position would use under similar circumstances.

242.    As members of the Initial Board, Messrs. Horn, Breitkopf, and Saltzman had actual knowledge of, and/or had reason to know of, the material design and construction defects in the Building, as alleged above.

243.    Messrs. Horn, Breitkopf, and Saltzman acted in bad faith in deliberately cutting corners when constructing the building, leading to the defects described in paragraphs 76–100 and 126–183 above.   They hired below-average construction workers while maintaining the same offering price and representing the same quality of construction.   Their decisions to cut corners in constructing the building were made in a manner departing from the Offering Plan and were calculated to save money for Alchemy.   Their actions were in bad faith and tainted by conflicts of interest.

244.    Furthermore, Messrs. Horn and Breitkopf failed to correct deficient construction in the Building, and when they received notice of defects, failed to address them properly, ultimately concealing known defects when Plaintiffs entered into the Purchase Agreement.

245.    By reason of the foregoing, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial, in no event less than $75,001.

## COUNT VI

### Breach of Fiduciary Duty
(Against Joel Breitkopf as a Member of the Second Condominium Board)

246.    Plaintiffs repeat and reallege the facts set forth in paragraphs 1–245 above as though fully set forth herein.

247.    When the Offering Plan was accepted for filing on October 8, 2020, Mr. Breitkopf was listed as a member of the Initial Board.  Mr. Breitkopf also served as a member of the Board of Managers that followed the Initial Board until May 21, 2025.  When Mr. Breitkopf was appointed to the Initial Board, he was a Principal at Alchemy.

248.    As a member of the Board of Managers, Mr. Breitkopf owed a fiduciary duty to the Condominium and its unit owners, where he was required to perform his duties as a board member with due care, in good faith, and loyally to the Condominium and its residents.

249.    As a Principal at Alchemy and a board member, Mr. Breitkopf had a duty to not act to benefit Alchemy at the expense of the unit owners.

250.    However, Mr. Breitkopf breached his fiduciary duties to Plaintiffs when he unreasonably required Plaintiffs to release all claims against Alchemy as a prerequisite to entering into the Alteration Agreement to fix the substantial construction defects that permeated throughout Unit PHA as a result of Alchemy's shoddy construction.  Mr. Breitkopf's decision to prevent the Alteration Agreement from being approved was plagued by self-dealing and conflicts of interest in violation of his fiduciary duties to unit owners.  Mr. Breitkopf engaged in bad faith, unreasonable negotiations with Plaintiffs regarding the Alteration Agreement in a manner designed to delay Plaintiffs from getting approval for much needed renovations to correct the extensive defects that permeate their Unit.

251.    If Plaintiffs had executed the Alteration Agreement as presented, they would have been at risk of releasing Alchemy of any and all liability—including liability for the costs of repairing the latent construction and installation defects in the $24,750,000 Unit.  It is unconscionable to insist that the defects for which Alchemy is responsible cannot be fixed unless Alchemy is held harmless.

252.    Plaintiffs even proposed to the Board of Managers an Addendum to the Alteration Agreement that aimed to remove any release of Alchemy.  On December 23, 2024, however, Plaintiffs learned that the Board of Managers rejected the proposed Addendum and declined further comment.  Plaintiffs were informed that Mr. Breitkopf and Alchemy drove the Board's decision to reject the Addendum to the Alteration Agreement, thus blocking any progress with the Plaintiffs' efforts to diagnose and remediate the Unit's defects.

253.    By reason of the foregoing, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial, in no event less than $75,001.

## COUNT VII

### Unjust Enrichment
(Against All Defendants)

254.    Plaintiffs repeat and reallege the facts set forth in paragraphs 1–253 above as though fully set forth herein.

255.    By reason of the foregoing conduct—including defrauding Plaintiffs and willfully breaching the agreement with Plaintiffs as alleged herein—Defendants have profited and enriched themselves unjustly at the expense and detriment of Plaintiffs.

256.    Defendants should not be permitted, in equity and good conscience, to retain for themselves any funds wrongfully obtained from Plaintiffs.

257.    Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial, in no event less than $75,001.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

a.    Award compensatory damages in an amount to be determined at trial;

b.    Award incidental and consequential damages in an amount to be determined at trial;

c.    Order rescission of the Purchase Agreement;

d.    Decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiffs;

e.     Award punitive damages in an amount to be determined at trial;

f.     Award Plaintiffs' reasonable attorney's fees, costs, and disbursements;

g.     Award pre- and post-judgment interest; and

h.     Award any further legal and equitable relief as the Court deems appropriate.


Dated: July 29, 2025          Respectfully submitted,

By:  */s/ Jonathan M. Watkins*
Jonathan M. Watkins
Andrew D. Huynh
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, NY 10281
(212) 504-6000
jonathan.watkins@cwt.com
andrew.huynh@cwt.com

*Counsel for Plaintiffs*